290 N.J. Super. 1 (1996)
674 A.2d 988
STEPHEN WALSH, PLAINTIFF-RESPONDENT,
v.
STATE OF NEW JERSEY, DEPARTMENT OF THE PUBLIC ADVOCATE, OFFICE OF THE PUBLIC DEFENDER, PUBLIC DEFENDER, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued November 27, 1995.
Decided April 23, 1996.
*3 Before Judges PETRELLA, SKILLMAN and EICHEN.
Perry L. Lattiboudere, Deputy Attorney General, argued the cause for appellants (Deborah T. Poritz, Attorney General, attorney; Mary C. Jacobson, Assistant Attorney General, of counsel; Mr. Lattiboudere, on the brief).
Andrew T. Fede argued the cause for respondent (Contant, Scherby & Atkins, attorneys; Matthew S. Rogers, of counsel; Mr. Fede, on the brief).
The opinion of the court was delivered by EICHEN, J.A.D.
*4 Plaintiff Stephen Walsh is an Assistant Deputy Public Defender (ADPD). Defendants are the State of New Jersey, the Department of the Public Advocate, the Office of the Public Defender, and the Public Defender (the commissioner). In December 1993, Walsh sued defendants alleging breach of an agreement to promote him. After a bench trial on February 15, 1995, the trial judge determined there was an enforceable implied-in-fact contract to promote Walsh after one year from an ADPD II to an ADPD I. Accordingly, the trial judge determined that Walsh was entitled to recover the stipulated sum of $29,521.66 in damages, representing the salary differential between his employment status as an ADPD II and an ADPD I and ordered that "plaintiff be placed in the classification and salary step of Assistant Deputy Public Defender I as of June 1994," receiving all the increments and raises awarded for that position since that date. A consent order of judgment embodying the court's directives was entered on February 22, 1995.
Defendants argue on appeal that the trial court erred because the record does not support the existence of a firm and definite offer to promote Walsh which was capable of acceptance. They assert that the record lacks sufficient proof to support the conclusion of a "mutual agreement" or any intent on the part of defendants to make such an offer. Finally, defendants maintain the record cannot support the judge's conclusion that defendants' representatives had actual or delegated authority to promise Walsh a promotion.[1]
We affirm substantially for the reasons expressed by the trial judge in his oral bench opinion on February 15, 1995. However, *5 we consider it appropriate to recite the genesis of this dispute and to comment further on defendants' claims of error.
Walsh was employed as an ADPD in the Bergen region office of the Office of the Public Defender from 1980 to 1986. Hired as an ADPD III, he was eventually promoted to an ADPD I, in which capacity he alleges he served for two and one-half years before he went into private practice in 1986. In 1988, learning that Walsh was not content in private practice, Ellen Koblitz,[2] the Deputy Public Defender in charge of the Hudson region office of the Office of the Public Defender, invited Walsh to resume practice as a public defender in the Hudson region office. Koblitz and Walsh had worked together in the Bergen region office for several years and, therefore, Koblitz was familiar with his professional skills and wanted him to join the Hudson region office.
Based upon information provided to her by Thomas S. Smith, Jr., the First Assistant Public Defender, Koblitz offered Walsh the position of an ADPD I with a salary of $42,266.82. Interested in getting the highest possible salary for Walsh, but unfamiliar with the various position classifications and commensurate salaries, Koblitz discussed the matter further with Smith. Smith then spoke with John DeVaney, the chief personnel officer for the Office of the Public Advocate.[3] Following their discussion, DeVaney constructed a plan whereby Walsh would return to the Public Defender's Office at a lower level than that when he had left in 1986. Specifically, he would begin as an ADPD II-step four, receiving a salary of $41,986.96, but be promoted to a Level ADPD I, after one year, which would enable him to receive a salary greater than if he had started as an ADPD I.
*6 Koblitz described the conversation she had with DeVaney as follows:
[DeVaney] called me because he had an idea ... [t]hat he thought would benefit Steve in the long run. And he suggested to me that if Steve took a slightly lesser salary and instead of being an ADPD I..., he was  I believe it was the highest slot in the ADPD II title[,] [t]hat he could be promoted in one year. And due to the workings of the salary and title system, Mr. DeVaney explained to me that he would end up making more money, that even though during that one year, he would have a slightly lesser salary, that because he was being promoted from the highest level in one category, he would jump up higher and would make up the differential and the salary for that first year quickly. And then be making more money. So it was a plan that would result in Steve making more money in the long run. That's what Mr. DeVaney explained to me.
Koblitz testified that although she did not understand DeVaney's suggestion to be "a guarantee," she understood it to imply that Walsh would be promoted, not merely that he would be eligible for a promotion:
I mean, here is somebody who is being offered the higher title, could take the higher title now. To say maybe he won't be promoted to that same title in a year didn't really make sense. The underlying assumption was he would be promoted to that title in one year. (emphasis added)
After speaking with DeVaney, Koblitz spoke with Walsh. She described part of her conversation with Walsh as follows:
I told him that ... I would recommend him for a promotion, assuming that he worked out as [] I fully expected him to work. And there was some qualification that his work would have to be of a good quality. And I'm sure I said it tactfully, because I fully expect that it would be of a good quality. But I didn't feel it was appropriate to hire somebody and guarantee them a promotion without there being the condition that they perform in the job. (emphasis added)
Hence, Koblitz testified she placed "a slight caveat" on her promise to recommend Walsh for promotion, that he "would have to perform satisfactorily in the job."[4]
Walsh testified that, as he understood the process, first there would be a recommendation for a promotion and then afterward, *7 approval of the promotion; however, he "underst[ood] that in this situation, after the recommendation was going to be made [by Koblitz], [he] would get the promotion." He explained, "I had no concerns that I would do a good job. So in my mind, the promotion was going to happen." He also stated that it was never indicated to him that the promotion might not occur. With this understanding, despite the fact he could have accepted the higher ADPD I position, Walsh agreed to take the lower position and salary, and began work in July 1988.
After one year, by letter to Smith dated July 18, 1989, Koblitz "strongly recommend[ed]" Walsh for a promotion. Smith denied the promotion on the ground that an ADPD II had to remain in the position for two years before becoming eligible for promotion. The record reflects Smith had not communicated the two-year eligibility requirement to Koblitz or Walsh at the time of the initial hire in 1988. Koblitz then asked Smith "in the strongest possible terms" for an extra salary increase for Walsh. This request was approved by Smith; however, by the time the request was forwarded to the Governor's Office, Department of Treasury, the State had instituted a freeze on all promotions and salary adjustments absent "extraordinary and compelling" circumstances, and the paperwork was returned. On May 8, 1990, approximately two years after Walsh had returned to work as a public defender, Koblitz again recommended Walsh for a promotion to an ADPD I, this time under the "extraordinary and compelling" standard. This request was repeated in June and August 1991. However, due to the continuing freeze on promotions, the commissioner (then Wilfredo Carabello) denied the request.[5]
On December 2, 1993, Walsh filed a verified complaint in lieu of prerogative writs in the Superior Court, Law Division, Hudson County, seeking damages for breach of the alleged oral agreement *8 to promote him. At trial, Smith testified the commissioner was the appointing authority and that, unless he directed otherwise, the commissioner was the sole authority to hire and promote public defenders. However, Smith admitted he did not speak with the commissioner before providing Koblitz with a salary figure to offer Walsh and before Koblitz's letter to Walsh confirming the job offer and a salary of $42,266.82.
DeVaney described his duties and responsibilities as the chief personnel officer. He stated he "was responsible for the hiring, firing, promotion, demotions, training, and payroll and anything that had to do with personnel matters," including legal staff for the individual regions throughout the State. DeVaney testified he "had the authority invested in [him] by the commissioner to make job offers." DeVaney also testified that he could waive written offers and make an oral offer of employment because he is "in charge." He testified further that he was the person who modified a personnel request form submitted on behalf of Walsh, crossing out the ADPD I designation with the higher salary and inserting in its place the ADPD II-fourth step designation with the lower salary. The request form bears DeVaney's and Koblitz's initials and, at trial, DeVaney acknowledged that the form "reflect[s] the agreement ... or understanding that [DeVaney] and [Koblitz] had with regard to switching [Walsh] from an ADPD I to an ADPD II fourth step."
DeVaney further testified that the commissioner was the "primary ... appointing authority," but that DeVaney was "the appointing authority under [the] civil service rules and regulations for the Department of the Public Advocate." In fact, upon inquiry from the trial judge, DeVaney admitted that if he made a job offer to someone, either orally or in writing, before checking with any other "offices," and if the other "offices" disagreed with the appointment, the offer was nonetheless a binding offer because DeVaney had appointing authority. On the other hand, during cross-examination by defendants, DeVaney noted that "the commissioner is the sole appointing authority for the department," *9 and that his function is merely to "implement the civil service rules pertaining to [a] hire ... [after] the commissioner ... approves an appointment." However, DeVaney also indicated that "if the commissioner is not around, the letters go out under my signature, since I'm the appointing authority under civil service."
In hiring legal staff, Koblitz dealt only with either DeVaney or Smith and never with the commissioner. Koblitz testified that, in her opinion, Smith had the authority to offer legal positions and an appropriate salary. She was not aware how involved the commissioner, the governor's office, or the treasury department had to be in the hiring, promotion or salary adjustment process. From her perspective, Smith's approval was enough. At that time, there were no written guidelines for hiring which DeVaney, Smith or Koblitz had to follow. Koblitz knew that she "could not hire or fire anybody [her]self," that she had to make recommendations, and that someone superior to her had the authority to make the ultimate decision; nonetheless, until Walsh's situation, she had never before experienced rejection of her recommendations for a promotion.
At the conclusion of the trial, the court ruled in favor of Walsh, stating:
Now I find from the evidence based on the testimony and all of the exhibits, from what Mr. DeVaney says, from what Ms. Koblitz has said, that there was an offer. Koblitz understood that. DeVaney understood it. He knew that the plaintiff understood he was being offered a promotion subject to the ordinary rule of competent performance....
Because they knew that he was rejecting an offer of class I at a higher salary, was taking the lower salary. And that the reason he was doing this was because they [were] leading him to understand that at the end of a year, he'd get the promotion. Now to make it clear where this comes from so that others may find it, DeVaney understood this.... And as a matter of common sense, Smith had to know it. I don't think it matters whether Smith knew it or he didn't know it.... But I find as a matter of common sense he had to know it. People don't take a lesser salary and a demotion for no reason. And he knew all about it. He said DeVaney had talked to him about it.
... I find there was an offer. It was reasonably understood by the plaintiff to be an offer. And he accepted [by] performance.
* * *

*10 I find that DeVaney had actual authority. He said he had actual authority. I believe him. I take his testimony 100%. He had the authority to do it. He had the authority to do it with an oral agreement.
The fact that he ordinarily didn't do it doesn't change what his authority was. I accept his testimony totally.
And as a matter of common sense, I fully understand what DeVaney understood. And DeVaney agreed with it.
... The head of the [public defender] department is the legal appointing authority.... But a lot of the things like that are delegated. They got to be. That's just a normal course of business of the State. And Mr. DeVaney made it perfectly clear that for civil service purposes, he was the appointing authority. He was the one that said okay. He's the one that made sure that all the things that had to be done were done.
We agree with the trial judge's reasoning and conclusions.
A contract may be expressly created by specific words or it may be implied-in-fact, created by conduct rather than words. See Weichert Co. Realtors v. Ryan, 128 N.J. 427, 436, 608 A.2d 280 (1992). Over the past decade, our courts have been willing to recognize implied-in-fact contracts in the at-will employment setting. See, e.g., Woolley v. Hoffmann-La Roche, Inc., 99 N.J. 284, 491 A.2d 1257, modified, 101 N.J. 10, 499 A.2d 515 (1985). Likewise, public entities may be bound by contracts implied-in-fact. See N.J.S.A. 59:13-3 (providing that "[t]he State of New Jersey ... waives its sovereign immunity from liability arising out of ... a contract implied in fact").
Defendants argue that no implied-in-fact contract was created because they made no firm offer, implied or otherwise. As a basic proposition, this principle is sound. However, if a reasonable person is led to believe an offer has been made, then the "offeror" may have conferred upon the offeree the power to create a contract by the latter's acceptance of the "offer." Creek Ranch, Inc. v. New Jersey Turnpike Auth., 75 N.J. 421, 428, 383 A.2d 110 (1978); see also Esslinger's, Inc. v. Alachnowicz, 68 N.J. Super. 339, 344-45, 172 A.2d 433 (App.Div. 1961) (whether an offer, capable of acceptance, has been made depends upon "what meaning the words should have conveyed to a reasonable person cognizant of the relationship between the parties and all of the antecedent and surrounding facts and circumstances").
*11 Implicit in the trial judge's findings is the determination that Walsh was led by defendants' representatives reasonably to believe that, by commencing employment and performing as a ADPD II-fourth step, a contract had been formed to promote him after one year to the position of an ADPD I. DeVaney himself acknowledged that it was a fair expectation that Walsh would get the promotion if he took the ADPD II position, performed satisfactorily, and after one year received a recommendation from Koblitz. Although DeVaney testified he did not guarantee Walsh would be promoted, he also did not suggest Walsh might not be promoted despite Koblitz's recommendation. The record amply supports the conclusion that Walsh reasonably understood that it was DeVaney's intention to contract with him on behalf of defendants. The promise to promote Walsh was thus implied in the circumstances of the hiring.
Moreover, the record supports the conclusion that DeVaney had actual authority to promise Walsh a promotion on behalf of the commissioner. Certainly, DeVaney's authority to bind the commissioner was implied in the manner in which he dealt with Koblitz and Smith. As our Supreme Court long ago instructed:
[A]ctual authority may be express or implied. Implied authority may be inferred from the nature or extent of the function to be performed, the general course of conducting the business, or from the particular circumstances of the case.
[Carlson v. Hannah, 6 N.J. 202, 212, 78 A.2d 83 (1951).]
While N.J.S.A. 2A:158A-6 statutorily authorizes the commissioner to appoint ADPD's who "serve at the pleasure of the Public Defender," it does not prevent the commissioner from delegating that authority to his or her duly designated representatives. Thus, we are satisfied the trial court properly inferred both agency and authority.
Further, were we to conclude defendants' representatives did not have the authority to make an offer of promotion to Walsh in these circumstances, we would be permitting an injustice to go unredressed. This we will not do. Government "has the obligation to deal forthrightly and fairly." W.V. Pangborne & Co. v. New Jersey Dep't of Transp., 116 N.J. 543, 557, 562 A.2d 222 *12 (1989). Especially "in the exercise of statutory responsibilities, government must `turn square corners'...." Id. at 561, 562 A.2d 222. "[The government's] primary obligation is to comport itself with compunction and integrity, and in doing so government may have to forego the freedom of action that private citizens may employ in dealing with one another." Id. at 561-62, 562 A.2d 222 (citation omitted). "[G]overnment [must] adhere to strict standards in its contractual dealings." Id. at 562, 562 A.2d 222.
While technically none of defendants' representatives actually told Walsh his promotion was "guaranteed," or that formal approvals were merely ministerial acts that would surely be forthcoming, neither did they tell Walsh that his and their expectations for Walsh's promotion in a year might be defeated by untoward events. Smith certainly did not advise that Walsh's promotion might have to wait two years rather than the one year initially indicated; and DeVaney did not tell Walsh or Koblitz he was merely a "civil servant" without the power or authority to carry through on his initiative. DeVaney's and Smith's conduct precluded Walsh from making a fully informed decision concerning the risks involved in receiving a promotion before he gave up the ADPD I position and salary for which he would have originally been hired, but for the acts of Smith and DeVaney. Given the unique situation here, DeVaney and Smith had a duty to explain to Walsh or Koblitz that Walsh's promotion was not guaranteed before they suggested he accept a lower position. Only by enforcing the promise made by the commissioner's duly delegated representatives can defendants fulfill their obligations of good faith and fair dealings to Walsh in these circumstances. See id. at 561, 562 A.2d 222. Finally, we note our decision affirming the trial judge's findings and conclusions is not intended to bind defendants each and every time their delegated agents make an offer affecting the employment of an ADPD. As this decision explains at length, this case presents obvious special equities.
Affirmed.
*13 SKILLMAN, J.A.D., dissenting.
I am unable to agree with the majority opinion's underlying premise that the Public Defender or the Public Defender's representative has the statutory authority to make an enforceable agreement to promote an Assistant Deputy Public Defender at some future date. Therefore, I respectfully dissent.
The Legislature has directed that any person appointed to the position of Assistant Deputy Public Defender "serve[s] at the pleasure of the Public Defender and shall receive such salar[y] as he shall from time to time designate." N.J.S.A. 2A:158A-6.[1] Consequently, so long as his personnel actions are not invidiously discriminatory, the Public Defender has unfettered discretion in determining whether to hire, discharge, transfer, demote or withhold promotion from an Assistant Deputy Public Defender. See English v. College of Medicine & Dentistry of N.J., 73 N.J. 20, 23, 372 A.2d 295 (1977); Wachstein v. Slocum, 265 N.J. Super. 6, 625 A.2d 527 (App.Div.), certif. denied, 134 N.J. 563, 636 A.2d 521 (1993). Thus, each of the four persons who occupied the position of Public Defender during the period from 1988 to 1993 retained the continuing authority to decide whether to promote plaintiff from the position of Assistant Deputy Public Defender II to Assistant Deputy Public Defender I.
Furthermore, the Legislature has imposed certain external constraints upon the power of the Public Defender and other high level state executive officials to award promotions and salary *14 increases to their subordinates. The Commissioner of Personnel is authorized to "[e]stablish, administer, amend and continuously review a State classification plan governing all positions in State service," N.J.S.A. 11A:3-1(a), and to "[p]rovide a specification for each title." N.J.S.A. 11A:3-1(e). Pursuant to this authority, the Commissioner of Personnel has issued specifications for the various Assistant Deputy Public Defender titles. The Commissioner also exercises authority pursuant to N.J.A.C. 4A:4-1.10 to review and approve any proposed promotion of an Assistant Deputy Public Defender. In addition, through the Annual Appropriations Act, the Legislature has established a Salary Adjustment Committee, consisting of the Commissioner of Personnel, the State Treasurer and the Director of the Division of Budget and Accounting, to establish rules governing salary ranges, rates of pay and salary adjustments for State employees. See, e.g., L. 1988, c. 47, at 348; L. 1989, c. 122, at 690; L. 1990, c. 43, at 433-34; L. 1991, c. 185, at 1100; L. 1992, c. 40, at 399. Pursuant to this authority, the Salary Adjustment Committee has adopted rules governing the salaries of employees in the executive branch of government. In re Boyan, 127 N.J. 266, 268, 604 A.2d 98 (1992).[2]
The Public Defender's failure to initiate the promotion of plaintiff to the position of Assistant Deputy Public Defender I constituted a valid exercise of these statutory and regulatory powers. Plaintiff does not allege that there was any invidiously discriminatory reason for his failure to receive a promotion. In fact, plaintiff appears to concede that he did not satisfy the prerequisite of two years prior service in the title of Assistant Deputy Public Defender *15 II when the Public Defender failed to promote him in 1989,[3] and that he was not promoted in early 1991 because the Governor's office, through the Salary Adjustment Committee, had adopted a freeze on all promotions except upon a showing of "extraordinary justification and compelling need." Thus, even if the Public Defender had undertaken to promote plaintiff, it seems clear that the promotion would not have received the required approvals of the Commissioner of Personnel and Salary Adjustment Committee.
The majority's conclusion that subordinates of the Public Defender made an enforceable promise to promote plaintiff to the position of Assistant Deputy Public Defender I rests upon private sector employment decisions that "have been willing to recognize implied-in-fact contracts in the at-will employment setting." (maj. op. at 10, 674 A.2d at 993). See Woolley v. Hoffmann-La Roche, Inc., 99 N.J. 284, 491 A.2d 1257 (1985). However, the relationship between an Assistant Deputy Public Defender and the Public Defender, like the relationship between other public officials and the agencies appointing them, "is not ipso facto contractual in character," Espinos v. Township of Monroe, 81 N.J. Super. 283, 288, 195 A.2d 478 (App.Div. 1963), but is instead controlled by the statutes pursuant to which the public official has been appointed. Consequently, "[i]t is basic that `one accepting a public office or position is presumed to do so with full knowledge of the law as to salary, compensation and fees,'" and that "all limitations prescribed must be strictly observed." Shalita v. Township of Washington, 270 N.J. Super. 84, 91, 636 A.2d 568 (App.Div. 1994) (quoting Espinos v. Township of Monroe, supra, 81 N.J. Super. at 288, 195 A.2d 478). Therefore, whatever subjective understanding plaintiff may have had of the statements made by the Public Defender's representatives at the time of his appointment, he is presumed to have accepted the position of Assistant Deputy Public *16 Defender II with full knowledge of the Public Defender's continuing authority to decide whether to promote him as well as the supervisory authority of the Commissioner of Personnel and the Salary Adjustment Committee with respect to any recommended promotion or salary adjustment.
The majority's opinion goes to great lengths to show that the Public Defender delegated broad authority to one of his subordinates, John DeVaney, with respect to the hiring and promotion of Assistant Deputy Public Defenders. However, even the Public Defender personally could not have made an enforceable agreement to promote plaintiff at some future date, because such an agreement would be inconsistent with the legislative mandate that all Assistant Deputy Public Defenders serve at the pleasure of the Public Defender, N.J.S.A. 2A:158A-6, and the requirement that any recommended promotion be approved by the Commissioner of Personnel. N.J.A.C. 4A:4-1.10. Thus, even if the amorphous oral assurances of a future promotion given to plaintiff by the Public Defender's subordinates had been reduced to a written contract signed by the Public Defender personally, it would have been unenforceable.
When the Legislature has determined that it would be in the public interest for a governmental agency to enter into binding contractual arrangements with its employees, it has authorized the agency to create terms of office or to enter into employment contracts.[4]See, e.g., N.J.S.A. 5:10-5(t) (authorizing the Sports and Exposition Authority to "appoint and employ a president, who shall be the chief executive officer, and such additional officers ... and employees as it may require and to determine their qualifications, terms of office, duties and compensation"); N.J.S.A. 13:17-5(g) (authorizing the Hackensack Meadowlands Development Commission to "appoint, ... such employees ... as it may require, *17 and ... determine their ... terms of office, duties services and compensation"). However, with regard to the Office of the Public Defender, the Legislature made the contrary determination that the public interest would be best served by Assistant Deputy Public Defenders serving at the pleasure of the Public Defender.
Therefore, the practical effect of the majority's decision is to transform a statutorily mandated at will employment relationship into a contract of employment which is binding upon successors to the Public Defender in office when the purported contract was made. The majority's decision also allows purported promises of subordinate officials in the Office of Public Defender to preempt the Commissioner of Personnel's supervisory authority over promotions as well as the Governor's authority to control the cost of the operations of the executive branch of government through the imposition of a temporary freeze upon promotions. Cf. Communications Workers of Am., AFL-CIO v. Florio, 130 N.J. 439, 461-62, 617 A.2d 223 (1992).
In my view, our essential responsibility in deciding this appeal is to enforce the statutory and regulatory provisions under which plaintiff was appointed to the position of Assistant Deputy Public Defender. Accordingly, I would reverse the judgment entered against defendants and dismiss plaintiff's complaint.
NOTES
[1] Defendants also argue for the first time on appeal that because "all State employees need Salary Adjustment Committee approval for salary modification," Walsh's asserted oral agreement is ultra vires. This argument, not having been raised below, is deemed waived. But even if we were to consider the argument, it is rejected for the reasons later explained in this decision.
[2] Ellen Koblitz is now a judge of the Superior Court of New Jersey.
[3] The Office of the Public Defender was a part of the Office of Public Advocate in 1988. By legislation effective July 1, 1994, the Department of Public Advocate was abolished and all of its functions, powers and duties were terminated. The Office of the Public Defender was continued and transferred to and constituted as the Office of the Public Defender in, but not of, the Department of State effective the same date. N.J.S.A. 52:27E-51, 55.
[4] There is no dispute that Walsh fully performed his duties in accordance with the high expectations of the parties. In fact, Walsh is still employed as an ADPD in the Hudson office. Notably, however, despite the judge's order of February 22, 1995, Walsh did not receive notice of his promotion to ADPD I until November 30, 1995 after oral argument of this appeal.
[5] At the time Walsh was rehired in 1988, Alfred Slocum was the commissioner. For a short period following Slocum's departure, Smith served as commissioner on an interim basis. By 1990, the commissioner's position was occupied by Wilfredo Carabello, and thereafter, in 1992, by Zulima Farber.
[1] I note that the Legislature has conferred the same authority upon the Public Defender with respect to Assistant Deputy Public Defenders as the Governor possesses with respect to most cabinet members. N.J. Const., Art. 5, § 4, para. 2 (any single head of a "principal department" serves "at the pleasure of the Governor"). In addition, numerous subordinate officials in the executive branch of state government serve "at the pleasure of" a cabinet or subcabinet official. For example, N.J.S.A. 52:17A-7 provides that "Deputy Attorneys-General and Assistant Attorneys-General in the Department of Law and Public Safety shall hold their offices at the pleasure of the Attorney-General and shall receive such salaries as the Attorney-General shall from time to time designate."
[2] As noted in our opinion in In re Boyan, 246 N.J. Super. 300, 305 n. 6, 587 A.2d 640 (App.Div. 1991), these rules are not published in the New Jersey Register or any other publication. Since 1991, the Annual Appropriations Act has provided that the Salary Adjustment Committee's directives "shall not be considered an `administrative rule' or `rule' within the meaning of [the Administrative Procedure Act, N.J.S.A. 52:14B-1 to -15]." See, e.g., L. 1991, c. 185, at 1100; L. 1993, c. 155, at 815.
[3] The record is unclear as to whether this was one of the specifications of the Assistant Deputy Public Defender I title when plaintiff was appointed to the position of Assistant Deputy Public Defender II in 1988.
[4] Even when a governmental agency has the statutory authority to enter into a fixed term employment contract, it still in some circumstances may abolish the position in order to promote economy and efficiency in government operations. See Stone v. Township of Old Bridge, 111 N.J. 110, 121-22, 543 A.2d 431 (1988).