Reversed and remanded for further proceedings consistent with this opinion.

764 A.2d 455

LOIS MISKOWITZ, PLAINTIFF–APPELLANT, v. UNION COUNTY UTILITIES AUTHORITY, DEFENDANT–RESPONDENT.

HARRY P. PAPPAS, PLAINTIFF–APPELLANT, v. UNION COUNTY UTILITIES AUTHORITY, A PUBLIC BODY CORPORATE AND POLITIC OF THE STATE OF NEW JERSEY; JAMES KENNEDY, AS CHAIRMAN OF THE UNION COUNTY UTILITIES AUTHORITY AND IN HIS INDIVIDUAL CAPACITY; EDWARD JACKUS, RICHMOND LAPOLLA, JOHN G. KULISH, WILLIAM WOLF, AS COMMISSIONERS OF THE UNION COUNTY UTILITIES AUTHORITY AND IN THEIR INDIVIDUAL CAPACITIES; COUNTY OF UNION; MICHAEL LAPOLLA, AS COUNTY MANAGER OF UNION COUNTY AND IN HIS INDIVIDUAL CAPACITY; AND LAWRENCE M. CAROSELLI, AS DIRECTOR OF FINANCE OF UNION COUNTY AND IN HIS INDIVIDUAL CAPACITY, DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued November 29, 2000—Decided January 5, 2001.

Before Judges BAIME, WALLACE, Jr. and LINTNER.

*Robert F. Renaud* argued the cause for appellant Lois Miskowitz in A–235–99T3 (*Palumbo & Renaud,* attorneys; *Mr. Renaud,* on the brief).

*Thomas P. Scrivo* argued the cause for appellant Harry P. Pappas in A–1342–99T2 (*McElroy, Deutsch & Mulvaney,* attorneys; *Mr. Scrivo, Florina A. Moldovan* and *Meredith A. Walling,* on the brief).

*Richard H. Bauch* argued the cause for respondent Union County Utilities Authority in both appeals and for respondents James Kennedy, Edward Jackus, Richmond Lapolla, John G. Kulish, and William Wolf in A–1342–99T3 (*Schenk, Price, Smith & King,* attorneys; *Mr. Bauch,* of counsel and on the briefs).

*Sandro Polledri* argued the cause for respondents County of Union, Michael Lapolla and Lawrence M. Caroselli in A–1342–99T3 (*Genova, Burns & Vernoia,* attorneys; *Mr. Polledri,* on the brief).

The opinion of the court was delivered by

BAIME, P.J.A.D.

 Plaintiffs Harry Pappas and Lois Miskowitz appeal from a summary judgment dismissing their complaints against the Union County Utilities Authority (UCUA), its individual members, and other public officers. At issue is whether the UCUA acted lawfully in terminating plaintiffs' fixed term employment contracts as part of a restructuring to meet the fiscal crisis prompted by federal decisions declaring unconstitutional New Jersey's solid waste flow orders. We hold that the UCUA's decision was incidental to the exercise of its statutory powers, and that plaintiffs' complaints were properly dismissed.

## I.

The UCUA administers Union County's solid waste management system. The system includes a resource recovery facility owned by the UCUA and operated by Ogden Martin Systems of Union, Inc., an ash residue disposal landfill owned by Empire Sanitary Landfill, Inc., and a countywide recycling program.

In 1988, the UCUA hired Miskowitz as a bookkeeper. She was promoted to assistant comptroller in 1994. As assistant comptroller, Miskowitz's duties included billing hauler and municipal accounts, scheduling maintenance on UCUA's vehicles, keeping employee attendance records and supervising assistants.

In 1996, the UCUA appointed Pappas to the position of deputy executive director. His duties included assisting the executive director in day-to-day operations, serving as acting executive director in his absence, attending meetings, dealing with vendors and consultants, overseeing bid specifications and invoices, and acting as liaison with UCUA commissioners and representatives of local governments.

Both Miskowitz and Pappas were given five-year contracts. Miskowitz's contract ran from March 9, 1994 to March 8, 1999. Pappas' contract was to run from January 2, 1997 to January 1, 2002. As we will note more fully later in our opinion, these contracts were inartfully drafted. Read literally, the agreements purport to guarantee that the plaintiffs' respective positions would not be abolished, and their duties would not be altered during the five-year fixed terms, at least in the absence of some act of misfeasance.

The operative contractual language in Miskowitz's employment agreement reads as follows:

*Termination*—EMPLOYER shall not abolish or alter EMPLOYEE's position or duties and EMPLOYEE shall not be discharged, disciplined, reprimanded, reduced in status, rank, or compensation, or deprived of any professional or employment advantage, or given any adverse evaluation of her[/his] performance without just cause.

The termination of the EMPLOYEE's employment shall be deemed to have been for "Cause" if termination of her[/his] employment shall have been the result of:

(i) an act or acts of dishonesty on the part of the EMPLOYEE constituting a felony or resulting or intended to result directly or indirectly in gains or personal enrichment at the expense of the EMPLOYER;

(ii) the continued willful failure by the EMPLOYEE to perform substantially her duties with the EMPLOYER (other than any such failure resulting from her incapacity due to physical injury or physical or mental illness) for a period of thirty (30) days after a demand for substantial performance is delivered to the EMPLOYEE in the form of a resolution adopted by the Authority's Commissioners which specifically identifies the manner in which the EMPLOYEE has not substantially performed her[/his] duties;

(iii) The EMPLOYEE's drug or alcohol addiction.

*Savings Clause*—Should any valid federal or state law or final determination of any court or administrative agency affect any provision of this AGREEMENT, the provision or provisions so affected shall be automatically conformed to the law or

determination and otherwise the AGREEMENT shall continue in full force and effect.

The contractual language in Pappas' contract is essentially the same, but there is one subtle difference. In Pappas' contract, the opening paragraph pertaining to termination is set forth in two separate sentences, the first prohibiting the employer from "abolish[ing] or alter[ing] the employee's position or duties" and the second barring the employer from making adverse employment decisions without "just cause." Pappas' agreement states in pertinent part:

*Termination*—EMPLOYER shall not abolish or alter EMPLOYEE'S position or duties. EMPLOYEE shall not be discharged, disciplined, reprimanded, reduced in status, rank, or compensation, or deprived of any professional or employment advantage, or given any adverse evaluation of her[/his] performance without just cause.

The five-year contracts were authorized by the Municipal and County Utilities Authority Law (*N.J.S.A.* 40:14B–1 to –78), which states that a municipal authority may appoint such personnel as it "may determine necessary for its efficient operations." *N.J.S.A* . 40:14B–18. The statute further provides that an authority "shall determine [the] qualifications, ... duties and compensation" of its employees "as it deems necessary," but that the terms of office and periods of such contracts may not exceed five years. *Ibid.* Employees hired by an authority are not subject to civil service laws or regulations. *N.J.S.A.* 40:14B–18.

In 1995, after Miskowitz's contract term had begun but before Pappas was hired, the Third Circuit rendered its initial decision in *Atlantic Coast Demolition v. Board of Chosen Freeholders*, 48 *F.*3d 701 (3d Cir.1995), finding that New Jersey's solid waste management system discriminated against interstate commerce. *Id.* at 717. The matter was remanded to the District Court for a determination as to whether New Jersey's statutory and regulatory scheme served a legitimate local purpose, and, if so, whether there were nondiscriminatory alternatives that would enable the State to accomplish its legitimate objectives. *Id.* at 717–18. On July 15, 1996, the District Court concluded that nondiscriminatory alternatives existed to control solid waste flows, and that New

Jersey's system violated the Commerce Clause. *Atlantic Coast Demolition v. Chosen Freeholders,* 931 *F.Supp.* 341, 358 (D.N.J. 1996). The District Court permanently enjoined the enforcement of New Jersey's statutory and regulatory scheme, but stayed the judgment for two years following exhaustion of all appeals to afford the State the opportunity to devise a nondiscriminatory alternative to its solid waste flow system. *Ibid.* The State appealed. The Third Circuit affirmed the District Court's judgment, but modified the stay. *Atlantic Coast Demolition v. Board of Chosen Freeholders,* 112 *F.*3d 652, 669 (3d Cir.1997). Under the Third Circuit's judgment, the stay was not to extend beyond the exhaustion of the State's petition for certiorari. *Ibid.* On November 10, 1997, the United States Supreme Court denied New Jersey's petition for certiorari.

Immediately after the Supreme Court's refusal to review the Third Circuit's judgment, the UCUA applied to the Union County Local Finance Board for the issuance of solid waste revenue bonds designed to restructure its $296 million debt. We need not describe the UCUA's application in detail. Suffice it to say, the UCUA proposal was prompted by the "crisis" precipitated by judicial abrogation of New Jersey's solid waste management system. The Local Finance Board's approval of the UCUA's plan was required under the Local Authorities Fiscal Control Law (Fiscal Control Law) (*N.J.S.A.* 40A:5A–1 to –27).

The Fiscal Control Law was enacted in 1983. Its articulated objective is to "promote the financial integrity of local authorities." *N.J.S.A.* 40A:5A–2. The statute requires local authorities to submit their annual budgets to the Division of Local Government Services in the Department of Community Affairs, and empowers the Local Finance Board to "take remedial action to address an emergency situation with respect to the financial conditions and operations" of such local authorities. *Ibid.* Upon the request of the Director of the Division of Local Government Services, the Local Finance Board may order "implementation of a [fiscal] plan to assure the payment of debt service on the obligations of [an]

authority, or provide relief from [a] financial burden" upon a finding that the authority faces serious continuing financial difficulty. *N.J.S.A.* 40A:5A–7; *see also Senate County and Municipal Government Committee Statement,* Assembly, No. 144 L.1983, c. 313 (Local Finance Board should intervene if the local unit has not undertaken a remedial plan).

Although the UCUA's plan did not specifically propose a reduction in force, it described in detail the urgency of the fiscal crisis resulting from the exhaustion of the federal stay. In November 1997, for example, the UCUA predicted that it could accommodate its debt for a little over a year before running out of funds. The UCUA represented that it would default on its bonds by 1999 unless it substantially restructured its operations. The Local Finance Board approved the UCUA's financial plan in April 1998.

Like other solid waste management districts, Union County faced substantial financial problems as a result of the *Atlantic Coast* decisions. Among other options, the Union County Board of Freeholders considered abandonment of the UCUA's solid waste system, a shutdown of its waste-to-energy facility, dissolution of the solid waste franchise with a restructured alternative based on economic flow control, and establishment of a system to recover stranded investments. A report submitted to the Board recommended renegotiation of the UCUA's service contract with Ogden Martin, termination or replacement of the UCUA's power sales agreement with Public Service Electric & Gas, restructuring of the UCUA's debt service, elimination of the UCUA's State loan bonds, and the sale of its waste-to-energy facility.

In response to the federal decisions, Union County amended its solid waste management plan in December 1997 and submitted it to the Department of Environmental Protection (DEP) for its approval. The proposal recommended reduction of the UCUA's budget from over $5 million to $1,685,770. To meet the more competitive market demands caused by the federal judiciary's invalidation of district solid waste flow orders, the proposal recommended a substantial reduction in tipping fees. The DEP condi-

tionally approved the amended Union County plan. In addition to the cost-cutting retrenchment proposed by the County, the DEP ordered the UCUA to privatize its resource recovery facility by leasing it to Ogden Martin, and to transfer the UCUA's recycling and solid waste enforcement programs to county agencies. The purpose of these modifications was to shift the UCUA's solid waste management responsibilities to private and public entities in order to reduce the UCUA's administrative budget. The amended solid waste management plan envisioned a $550,675 reduction in the UCUA's salaries.

The Department of the Treasury audited the UCUA's budget in 1997. Among other recommendations, the Department proposed the elimination of five-year employment contracts and the reduction of its executive staff to three positions—executive director, finance officer, and executive secretary. In its report, the Department observed that this restructuring was necessary "to achieve the ... goal of establishing a tipping fee consistent with market rates."

In February 1998, the UCUA created an ad hoc committee to study the UCUA's staffing needs. The committee consisted of Commissioners Edward Jackus, Richmond Lapolla, and John Kubish, as well as County Manager Michael Lapolla and Director of Finance Lawrence Caroselli. All of these individuals were later named as defendants in this case. The committee recommended elimination of numerous positions, including that of assistant comptroller and deputy executive director. Under the committee's restructuring plan, the assistant comptroller's position was unnecessary because Odgen Martin was to assume management of hauler accounts, and because the substantial reduction of the UCUA's vehicle fleet eliminated the need for elaborate maintenance schedules. The minuscule duties that remained in the assistant comptroller's job description were to be performed by a bookkeeper. In a similar vein, the deputy executive director position was to become extinct because all tipping, weighing, environmental and operational functions were to be transferred to

Ogden Martin, and the UCUA's recycling responsibilities were to be transferred to county agencies.

On May 13, 1998, the UCUA conducted a public meeting to consider the committee's recommendation. Although concern was expressed for the plight of discharged employees, a majority of the commissioners approved the committee's recommendation, noting that the UCUA was losing $60,000 a day and soon would be unable to fund its payroll. The following day, the UCUA hand-delivered letters to the plaintiffs informing them that their positions had been abolished and that their employment would end on June 14, 1998.

Miskowitz immediately sued the UCUA for breach of contract, requesting a restraining order and a permanent injunction. Pappas brought suit several weeks later by filing an order to show cause and a multi-count complaint. Named as defendants in Pappas' suit were the UCUA, its commissioners, and the county manager and finance director of Union County. Pappas alleged breach of contract, breach of an implied covenant of good faith and fair dealing, deprivation of constitutional property rights, tortious interference with economic advantage, promissory estoppel, negligent misrepresentation and conflict of interest.

The defendants filed motions for summary judgment and a request to be heard on short notice on the return day of Pappas' order to show cause. Following oral argument, Judge Beglin dismissed Pappas' complaint against the individual defendants because the committee members neither participated in the vote nor had any decision-making authority to terminate plaintiff's employment. The judge dismissed the complaint against the individual commissioners because they had acted in their official capacities and in good faith. The complaint against Union County was dismissed because it was not involved in the decision to terminate plaintiffs' employment. The judge denied the UCUA's motion on the ground that factual issues required further exploration.

After discovery was completed, Judge Beglin granted the UCUA's motion. In a comprehensive oral opinion, the judge concluded that the UCUA acted lawfully in abolishing plaintiffs' positions notwithstanding their fixed term employment agreements. The judge reasoned that all "contract[s] of public employment" are subject to an "implied covenant," allowing for "termination for reasons of economy." As phrased by Judge Beglin, "so long as the governmental unit is exercising its statutory powers, promoting its legitimate objectives, and ... does so in good faith, it may lawfully terminate a fixed term or tenured employee."

## II.

Plaintiffs characterize the issue presented as one of contractual interpretation. They argue that local authorities, just as private persons, must adhere to the tenets of general contract law. *See, e.g., Greenberg v. Fornicola,* 37 *N.J.* 1, 10, 178 *A.*2d 339 (1962); *Borough of West Caldwell v. Borough of Caldwell,* 26 *N.J.* 9, 22, 138 *A.*2d 402 (1958); *Hankin v. Hamilton Township Board of Education,* 47 *N.J.Super.* 70, 78, 135 *A.*2d 329 (App.Div.), *certif. denied,* 25 *N.J.* 489, 137 *A.*2d 114 (1957). So posited, plaintiffs contend that we should merely apply the well-recognized common law rule allowing an employee to obtain compensatory damages for the employer's breach of a fixed term employment contract. *See, e.g., Stopford v. Boonton Molding Co.,* 56 *N.J.* 169, 189, 265 *A.*2d 657 (1970); *Meyers v. Potoker,* 3 *N.J. Misc.* 450, 450–51, 128 *A.* 601 (Sup.Ct.1925).

We note parenthetically that resolution of the issue presented would not be an easy task even if we were to accept plaintiffs' somewhat facile approach. Miskowitz's contract permits the UCUA to terminate her position for "just cause." The contract does not define that term, but instead states that "cause" for termination exists where the employee commits an act as specified in the agreement. It is unclear whether "just cause" and "cause" were intended to be equivalent terms, and whether the grounds for termination specified in the contract were intended to be all-

inclusive. These problems are compounded by additional ambigui-
ties in Pappas' contract, caused by the change in punctuation,
which arguably grants an ironclad guaranty against abolishment of
the employee's position or alteration of his duties.

We do not believe that the issue before us can fairly be resolved
by contractual interpretation. Realistically, the question present-
ed cannot be circumscribed so narrowly. We would be myopic
were we to see only the case before us. The issue must be
considered within the broader context of New Jersey's historical
efforts to control and regulate the flow of state-generated solid
waste. In reliance on the regulatory scheme invalidated by the
*Atlantic Coast* decisions, New Jersey's solid waste management
districts had incurred substantial debt to plan and construct state-
of-the-art facilities to minimize pollution. As of December 31,
1994, that public debt aggregated approximately 1.65 billion dol-
lars, a result of fifty-three separate bond issues by New Jersey
Counties and local authorities. *In re Passaic County Utilities
Auth.*, 164 *N.J.* 270, 276, 753 *A.*2d 661 (2000). The unanticipated
invalidation of New Jersey's statutory and regulatory scheme
permitted waste generators to bypass the sophisticated facilities
operated by the counties and local authorities in favor of cheaper
out-of-state landfills. *Ibid.* Deprived of what had been a captive
market, the counties and authorities experienced a drastic reduc-
tion in revenue, threatening the default of millions of dollars in
outstanding public debt. *Ibid.*

The complex and unanticipated events that resulted in the
invalidation of New Jersey's carefully crafted solid waste manage-
ment system produced the need for a new funding source to
address the stranded debt of counties and local authorities. Our
Supreme Court addressed that issue in *In re Passaic County
Utilities Auth.* There, the Court said that "legislative intervention
[was] essential." *Id.* at 306, 753 *A.*2d 661. At least in a tangential
sense, this case concerns the opposite side of the coin, *i.e.*, the
need of counties and local authorities to slash their solid waste

management budgets to meet the demands of a competitive market.

Against this factual backdrop, we perceive the issue presented in slightly different terms than those articulated by Judge Beglin. We need not, and do not, determine whether a governmental entity may, under ordinary circumstances, terminate a fixed term employment contract merely to effectuate economies or promote efficiency. As we have emphasized, the circumstances confronting the UCUA were extraordinary and unprecedented. Under the Fiscal Control Law, it would have been incumbent on the Local Finance Board to intervene had the UCUA defaulted in its obligation to reduce drastically its budget and to transfer its solid waste management functions to other public and private entities. After judicial abrogation of New Jersey's solid waste management system, the UCUA was not the same public agency that had hired Miskowitz in 1988 and had promoted her to assistant comptroller in 1994. By the time of her discharge, the UCUA was eviscerated; it was a mere image of what it had once been.

The issue is slightly different with respect to Pappas. At the time of his appointment in December 1996, the District Court had already entered a permanent injunction that was to take effect two years after the State had exhausted all of its appeals. Despite this ominous foreboding, the employment contract is silent with respect to what the parties' respective rights would be in the event the District Court's judgment was affirmed. Perhaps the parties envisioned that the Commerce Clause issue would not be authoritatively resolved within the five-year term of Pappas' contract, or that New Jersey would ultimately prevail. The record is wholly uninformative in that respect.

Putting that issue aside, the fact remains that the UCUA was a going concern when Pappas was appointed, but was a mere shell after the *Atlantic Coast* decisions were rendered. At the time of his discharge, Pappas' services were unneeded. His position was no more useful than a vestigial organ. Pappas and Miskowitz were thus in the same sinking boat when their positions were

abolished. We know of no jurisprudential principle that would compel public featherbedding under these circumstances. Nor is it responsible to say that the UCUA could discharge the vestigial employees but remain answerable in damages for the loss of their salaries. We are concerned here with public funds. The taxpayers should not be required to underwrite such a feckless policy.

We thus conclude that the UCUA acted within its express and implied statutory powers when it abolished plaintiffs' positions. In the face of a dire financial emergency, the local authority was within its rights in terminating plaintiffs despite their fixed term contracts.

Although we have been unable to find a reported opinion dealing with the precise issue presented, we do not write on a blank slate. In *Stone v. Old Bridge Tp.*, 111 *N.J.* 110, 543 *A.*2d 431 (1988), the executive director of a municipal utilities authority brought an action challenging the termination of his fixed term contract. The authority discharged the plaintiff when it was dissolved and replaced by a new governmental entity. The Chancery Division dismissed the plaintiff's complaint, holding that the Fiscal Control Law, under which the authority had been dissolved and the new agency created, did not mandate the continuation of any employment contract. Instead, the court found that the dissolution statute guaranteed the payment only of "creditors" and "obligees," which did not include employees with fixed term contracts.

We reversed the trial court's judgment over a vigorous dissent. 215 *N.J.Super.* 361, 521 *A.*2d 1329 (App.Div.1987). The majority did not consider the Fiscal Control Law controlling. Instead, it concluded that "engrafted upon all public contracts are the propositions that one is not paid for work that is unperformed," (citing *In re Williams*, 198 *N.J.Super.* 75, 77–80, 486 *A.*2d 858 (App.Div. 1984)), and "that positions may be abolished for reasons of economy" (citing *McCartney v. Franco*, 87 *N.J.Super.* 292, 297, 209 *A.*2d 329 (App.Div.1965)). 215 *N.J.Super.* at 367, 521 *A.*2d 1329. The dissenting opinion asserted that public entities must adhere to

ordinary contractual principles in their dealings with their employees, and that the "judicial remedy for breach [of an employment agreement] should ... protect [the] promisee's expectation interest in having the benefit of its bargain." *Id.* at 373, 521 *A.*2d 1329.

The Supreme Court reversed our determination and reinstated the Chancery Division's judgment. *Stone v. Old Bridge Tp.*, 111 *N.J.* 110, 123, 543 *A.*2d 431 (1988). The Court concluded that the Fiscal Control Law, and more particularly, the dissolution section, required only that an authority's debt obligation be enforced and honored, not an employee's fixed term contract. *Id.* at 119, 543 *A.*2d 431. Specifically, the Court held, "the enforceability of an employment contract on the successor local municipal utilities authority ... is a matter governed by the Fiscal [Control] Law, and under that law, the assumption of such contracts is not mandated but is remitted to the sound governmental discretion of the Authority, subject, of course, to the exercise of that discretion in good faith for legitimate governmental purposes." *Id.* at 117, 543 *A.*2d 431. Justices Clifford and Stein dissented. *Id.* at 123, 543 *A.*2d 431. They would have affirmed the Appellate Division's judgment "substantially for the reasons set forth in [its] majority opinion." *Id.* at 126–27, 543 *A.*2d 431.

■ Subsequent decisions have interpreted the Supreme Court's opinion in *Stone* as standing for the proposition that "[e]ven when a governmental agency has the statutory authority to enter into a fixed term employment contract, it still in some circumstances may abolish the position in order to promote economy and efficiency in governmental operations." *Walsh v. State,* 290 *N.J.Super.* 1, 17 n. 4, 674 *A.*2d 988 (App.Div.1996), *rev'd on other grounds,* 147 *N.J.* 595, 689 *A.*2d 131 (1997); *see also DiPaolo v. Passaic Bd. of Freeholders,* 322 *N.J.Super.* 487, 493, 731 *A.*2d 519 (App.Div.1999), *aff'd,* 162 *N.J.* 572, 745 *A.*2d 540 (2000); *Geraghty v. Berkeley Heights Tp.,* 259 *N.J.Super.* 350, 357, 613 *A.*2d 497 (Law Div.1990), *aff'd,* 259 *N.J.Super.* 327, 613 *A.*2d 485 (App.Div.1992); *see also Voges v. Borough of Tinton Falls,* 268 *N.J.Super.* 279, 287, 633 *A.*2d 566 (App.Div.1993), *certif. denied,*

135 *N.J.* 466, 640 *A.*2d 848 (1994). As argued by plaintiffs, perhaps that is too broad a reading of the Court's actual holding, which to a large extent was grounded in an interpretation of the Fiscal Control Law. We nevertheless note that in a somewhat related context, it is a well-established principle that a tenured civil service position may be abolished for reasons of economy as long as it is done in good faith. *See City of Cape May v. Coldren,* 329 *N.J.Super.* 1, 6, 746 *A.*2d 1003 (App.Div.2000); *McCartney v. Franco,* 87 *N.J.Super.* 292, 297, 209 *A.*2d 329 (App.Div.1965); *Greco v. Smith,* 40 *N.J.Super.* 182, 189, 122 *A.*2d 513 (App.Div. 1956); *Stone v. Camden Cty.,* 180 *N.J.Super.* 430, 438, 435 *A.*2d 143 (Ch.Div.1981). Similarly, it has long been recognized that tenured teacher positions may be abolished for reasons of economy. *N.J.S.A.* 18A:28–9; *see also Old Bridge Tp. Bd. of Educ. v. Old Bridge Educ. Ass'n,* 98 *N.J.* 523, 531, 489 *A.*2d 159 (1985); *Carpenito v. Board of Educ.,* 322 *N.J.Super.* 522, 531, 731 *A.*2d 538 (App.Div.1999). While these decisions are by no means on point, they are premised on the principle that governmental efficiency and economy may in some circumstances trump private contractual rights.

We hold that the UCUA lawfully terminated plaintiffs' fixed term contracts in a good faith effort to deal with the unprecedented financial crisis it confronted. Our conclusion comports with the Fiscal Control Law. It also advances the important public policy of assuring the financial integrity of local authorities. And finally, our holding advances the interests of taxpayers who should not be required to fund the salaries of unnecessary public employees.

### III.

Plaintiffs' remaining arguments are essentially derivative of their principal claim that the UCUA acted unlawfully in discharging them—an argument that we have rejected. We merely add that we find no merit in their additional contentions. *R.* 2:11–3(e)(1)(E).

Affirmed.