711 A.2d 300

STATE OF NEW JERSEY, OFFICE OF EMPLOYEE RELATIONS, PLAINTIFF–RESPONDENT, v. COMMUNICATIONS WORKERS OF AMERICA, AFL–CIO, AND AUDREY BOMSE, DEFENDANTS–APPELLANTS.

Argued February 17, 1998—Decided June 9, 1998.

*Steven P. Weissman,* argued the cause for appellants (*Weissman and Mintz,* attorneys).

*Mary L. Cupo–Cruz,* Senior Deputy Attorney General, argued the cause for respondent (*Peter Verniero,* Attorney General of New Jersey, attorney; *Mary C. Jacobson,* Assistant Attorney General, of counsel).

The opinion of the Court was delivered by

POLLOCK, J.

This appeal involves a dispute between the Communications Workers of America, AFL–CIO (CWA) and the State of New Jersey, Office of Employee Relations (OER or State) over the interpretation of Article V, Section J of the parties' 1992–95 Collective Negotiations Agreement, which concerns the termi-

nation of employment of unclassified employees. The parties submitted their dispute to an arbitrator who decided, among other things, that when the State gave no reason for terminating certain unclassified employees, the employees could submit to arbitration the question whether they had been terminated for misconduct. Finding that the arbitrator's award "reflected a reasonably debatable interpretation of the contract," the Law Division upheld the award. The Appellate Division reversed. 296 *N.J.Super.* 223, 226, 686 *A.*2d 781 (1997). Although the Appellate Division did "not necessarily disagree" with the arbitrator's interpretation of the contract, *id.* at 225, 686 *A.*2d 781, the court decided on its own motion that disputes over the interpretation of Article V, Section J were not arbitrable. *Ibid.* We granted the CWA's petition for certification, 150 *N.J.* 25, 695 *A.*2d 667 (1997), and now reverse.

## I.

Traditionally, the CWA and the OER negotiate a new labor agreement every three years. The 1989–92 labor agreement included a clause stating that employees with at least eight years of service could arbitrate disagreements over "major discipline." Major disciplinary penalties included discharges. In the 1992–95 labor agreement, the parties reduced the required number of years of service from eight to six.

Accordingly, the parties revised Article V, Section J of the previous labor agreement to include a new section 5. As revised, Section J read:

**J. Unclassified, Provisional and Special Services Employee Discipline Procedures**

1. The following shall constitute the disciplinary appeal procedure rights for unclassified and provisional employees who have been employed in such a capacity for a minimum of six (6) months....

In all disciplinary matters, except dismissal from service, such employees shall be entitled to utilize the provisions of this Article through the departmental hearing level.

2. In the event an unclassified or provisional employee is dismissed from State employment without receiving specific written reasons and such dismissal is not related to fiscal problems or programmatic changes and in the judgment of the

State such dismissal is not of a nature whereby the employee must be immediately removed from the work location, the State shall provide the employee with at least ten (10) calendar days notice in advance of the dismissal.

Unless there are exceptional circumstances, when such employees are dismissed from State employment due to misconduct, management shall serve the employee with the specific reasons relating to the misconduct. The employee may request and shall be granted a hearing by the department or agency head or his designee, whose decision shall be final. . . . The burden of proof for unclassified employees shall be on the employee.

3. It is understood that nothing herein shall be construed as limiting the State from exercising its inherent discretion to terminate unclassified employees who serve at the pleasure of the department or agency head, without stating the reasons therefore. Dismissal related to job performance shall not fall within the purview of this article. Grievances concerning the interpretation of this article shall be processed in accordance with Article IV as non-contractual (A.2.) grievances.

. . . .

5. Unclassified employees not covered by a statutory discipline procedure, who have served in unclassified titles for a minimum of six (6) consecutive years may appeal a Department level decision involving major discipline, for just cause, as defined under Section F.1. (a through d) of this article, to the Office of Employee Relations.

. . . .

The Office of Employee Relations will meet with the Union to review the record of the discipline within 30 days of receipt of the appeal from the Union. If the discipline appeal is not resolved at that meeting it shall be so noted in writing. The Union, may elect to appeal the discipline to binding arbitration.

. . . .

The arbitrators shall confine themselves to determinations of guilt or innocence and the appropriateness of penalties and shall neither add to, subtract from, nor modify any of the provisions of this Agreement by any award. The arbitrator's decision with respect to guilt, innocence or penalty shall be final and binding upon the parties.

. . . .

Article IV, referenced in Section J, identified two types of grievance: a contractual grievance (A.1 grievance) and a non-contractual grievance (A.2 grievance). Depending on the type of grievance, Article IV, Section H provided for two or three grievance steps. "Step One" required a grievance meeting or hearing. "Step Two" permitted a grievant to appeal the "disposition of the grievance at Step One" to the "Department Head or his designee." "Step Three," available only if "the grievance involve[d] an alleged

violation of the Agreement as described in ... A.1 above," authorized the CWA to appeal the Department Head's decision to an arbitrator. If the dispute proceeded to arbitration, Section H.5 provided in relevant part:

d. The arbitrator shall hold the hearing at a time and place convenient to the parties within thirty (30) calendar days of his acceptance to act as arbitrator and shall issue his decision within thirty (30) days after the close of the hearing. In the event a disagreement exists regarding the arbitrability of an issue, the arbitrator shall make a preliminary determination as to whether the issue is arbitrable under the express terms of this Agreement. Once a determination is made that such a dispute is arbitrable, the arbitrator shall then proceed to determine the merits of the dispute.

e. Whenever a grievance which is to be resolved at Step Three, Arbitration, is based on a provision of this Agreement in which the power or authority of the arbitrator is specifically limited to an advisory award, that limit shall be observed and all the provisions of paragraphs b, c and d above shall be operable except that the award and opinion shall be advisory and not binding on the parties. However, absent a particular exception the provisions of the grievance procedure above shall be operable.

Finally, Article V, Section D, provided, "The burden of proof in disciplinary procedures shall be upon the State, except as otherwise provided in J.2."

Soon after revising Article V, a dispute arose between the CWA and the OER concerning the scope of rights that Section J conferred on unclassified employees. The CWA complained that the State had terminated several unclassified employees with eight or more years of service without informing the employees of the reasons for their termination. According to CWA, the State had terminated the employees for misconduct. Consequently, under Section J.5, the employees were entitled to appeal their terminations for cause before an arbitrator. The OER disagreed. It maintained that the State terminated the employees for performance-related reasons, and, therefore, under Section J.3, the State retained the right to terminate for any reason or no reason.

The OER contends that if an unclassified employee believes the State terminated him or her for misconduct, the employee's only option is to file an A.2 non-contractual grievance within the

department. The appointing authority's decision would be final, and the employee would have no right to binding arbitration.

To illustrate their dispute, the parties referred to the case of Audrey Bomse. Since March 1984, Bomse had held the unclassified position of Assistant Deputy Public Defender. *See N.J.S.A.* 2A:158A–6 (providing that assistant deputy public defenders "shall serve at the pleasure of the Public Defender"); *N.J.A.C.* 4A:3–1.3(a)(4) (providing that employees who serve at the pleasure of appointing authority shall be allocated to the unclassified service). Effective December 30, 1992, the State terminated Bomse's employment on ten days notice, but did not provide her with a reason for the termination. Bomse filed a grievance with the OER on January 5, 1993, alleging a violation of Article V, Section J.2 because the State had failed to provide her with specific written reasons for the dismissal. Later, through the CWA, Bomse alleged that she was fired for misconduct and therefore entitled to arbitrate the dispute.

Initially, the OER was unsure whether it should attempt to stay the Bomse arbitration and request a court to decide the matter. Melvin L. Gelade, Director of the OER, expressed the State's position in a letter to Steven Weissman, CWA's counsel, dated February 1, 1993:

> I disagree with your letter of January 26, 1993, in which you contend that an issue of arbitrability is involved.
>
> Ms. Bomse was an unclassified employee who served at the pleasure of the Public Advocate, as set forth in the statute. As such, her termination is covered under Article V, Section J.3. of the Professional agreement. Pursuant to that section, grievances concerning the interpretation of the article are noncontractual and *not* subject to arbitration. There is no jurisdictional basis for arbitration.
>
> Accordingly, the State declines to submit any issues involving Ms. Bomse's termination to arbitration until such time as the CWA obtains a court order compelling arbitration. We disagree with your position that an arbitrator should decide his own jurisdiction. Rather, it is for the court to decide.

Because "cases were piling up involving issues coming out of Article V section J," however, the OER later agreed to "set forth on a specific arbitration regarding Article V, Section J." The OER further agreed to authorize the arbitrator to "decide what the

meaning was of J–1 through 5, and what was arbitrable under J–1 through 5, if anything." Although the parties agreed to rely on Bomse's case as an illustration, they instructed the arbitrator not to address the specific merits of her case.

Finally, the OER reserved the right to "make a court challenge in the event that it was held that someone terminated without reason, had arbitration rights." David Collins, Employee Relations Coordinator for the OER, memorialized the parties' agreement in a letter to Steven Weissman, dated August 10, 1993:

> As per our telephone conversation on August 9, 1993, it is my understanding that under Article IV (Grievance Procedure), Section H(5)(d), the parties agree to select arbitrator Carl Kurtzman to hold a hearing and render a written decision as to issues of arbitrability and contract interpretation of Article V, Section J, entitled, "Unclassified and Provisional Employee Discipline Procedures". For purposes of presenting the arbitrator with an actual factual background, the parties will use the Audrey Bomse case. It is understood, however, that the arbitrator in this proceeding shall not render a decision on Ms. Bomse's separation from State service.

At the initial hearing, the arbitrator identified three issues that the parties agreed to submit for arbitration. First, both parties asked the arbitrator to decide whether the State had violated Article V when it terminated Audrey Bomse from State service without stating any cause (the "at-will termination issue"). Second, the State proposed that the arbitrator decide the scope of Article V, Section J of the labor agreement when the CWA claims an employee was terminated for misconduct but the State gives no reason for the employee's termination (the "misconduct issue"). Third, the State requested the arbitrator to decide whether, in cases when the State terminates an employee for misconduct, the State or the CWA bears the burden of proof under Article V, Section J (the "burden-of-proof issue").

Pursuant to the parties' agreement, the arbitrator also placed on the record several stipulations regarding Audrey Bomse's termination. Neither party objected to the arbitrator's presentation of issues or stipulations. The State's counsel, however, added:

> If I may, the only thing I would also like to make clear is that even though we have utilized Audrey Bomse for an example, if you will, of facts and circumstances to set up this case for at least the major issues that the parties have agreed upon, you're not to render a specific decision with regard to Ms. Bomse's separation. This is simply a set of facts that has been established in order for you to make a contractual interpretation.

After hearing four days of testimony, the arbitrator made the following findings. The arbitrator ruled in favor of the OER on the at-will termination issue, finding "the State is not limited, due to the length of service of the unclassified employee, from exercising its inherent discretion to terminate unclassified employees who serve at the pleasure of the department or agency head, without stating the reasons therefore." Conversely, the arbitrator ruled in favor of the CWA on the misconduct and burden-of-proof issues.

The arbitrator found that an unclassified employee's right to appeal "major discipline" under Article V, Section J.5 encompassed cases in which the State terminates an unclassified employee without reason, but the CWA alleges that the discharge was for misconduct. The arbitrator concluded:

> Although an arbitrator in accordance with J.3, is precluded from substituting his judgment in place of management's in cases where dismissal is related to job performance, the [arbitrator] believes that J.5 empowers an arbitrator to review an A.2 determination that a dismissal is related to job performance as opposed to the Union claim that the dismissal is attributable to misconduct warranting discipline and, in those cases where the arbitrator determines that the dismissal is not related to job performance, proceed with a determination of the just cause of the disciplinary dismissal.

Additionally, the arbitrator concluded that if the CWA satisfies its burden of establishing that the State terminated the unclassified employee for misconduct, the State would bear the burden of proving just cause for the disciplinary dismissal. In reaching that conclusion, the arbitrator noted the tension between Sections J.2 and J.5 of Article V.

Section J.2, which applies generally to unclassified employees, places the burden of proof on the employee. The arbitrator ruled that allocating the burden of proof to the employee deviated from the traditional allocation of that burden to the employer. Section J.5, which applies to unclassified employees who appeal their

disciplinary termination to an arbitrator, is silent on the allocation of the burden of proof. Because Section J.5 requires a showing of "just cause," however, the arbitrator concluded that the parties intended disciplinary terminations under that section should adhere to the traditional allocation of the burden of proof. Thus, the arbitrator held that the State, as the employer, would bear the burden of proving just cause for misconduct of an employee with six or more years of service.

The State requested that the Law Division vacate the arbitration award on the misconduct and burden-of-proof issues. Finding that the arbitrator's award "reflected a reasonably debatable interpretation of the contract," and that it did not violate statutory law or public policy, the Law Division upheld the award.

The Appellate Division reversed, stating that it did "not necessarily disagree with the trial judge's view that the arbitrator's interpretation of the pertinent provisions was reasonably debatable and not offensive of public policy or specific statutory authority." 296 *N.J.Super.* at 225, 686 *A.*2d 781. Without notice to the parties, however, the court decided that disputes over the interpretation of Article V, Section J were not arbitrable. *Ibid.* Specifically, the court stated:

[W]e think there is a threshold issue concerning whether binding arbitration on the disputed interpretation of the provisions was within the authority of the arbitrator in the first instance. That is, does the contract confer upon the arbitrator authority to issue a binding interpretation of the provisions of Article V as they related to an unclassified employee with six or more years of service who has been separated from service without a statement of reasons? This precise issue was not addressed by the trial judge, most likely because the respective applications for confirmation and vacation of the arbitrator's decision may not have raised the issue. Since arbitration in the public-sector must comply with the parties' contract, the law, and the public policy, we think the issue critical. The answer seems quite clear to us. The applicable terms of the contract may authorize the parties to agree to an advisory opinion from the arbitrator but they do not permit binding arbitration on the threshold issue. On that basis alone we reverse.

[*Id.* at 225–26, 686 *A.*2d 781.]

The court acknowledged that "the parties chose not to submit the dispute to the Public Employment Relations Commission [(PERC)] ... or to the court in the first instance for a declara-

tion of arbitrability[,]" *id.* at 229, 686 *A.*2d 781, but rather "agreed to permit the arbitrator to consider the dispute 'pursuant to Article IV, § H.5(d).'" *Id.* at 230, 686 *A.*2d 781. Nevertheless, the court found significant that Article IV, Section H.5(d) required an arbitrator to make a preliminary determination regarding arbitrability if the parties disputed an issue's arbitrability. *Ibid.* The court found "nothing in Article IV, § H.5(d) or in the State's letter agreeing to submit the dispute under § H.5(d) which invokes *binding* arbitration on the preliminary determination." *Ibid.* Moreover, according to the court, Article V, Section J.3 unambiguously provided "that disputes concerning the interpretation of 'this article' are 'A.2' disputes and, therefore, expressly excepted from binding arbitration procedures." *Ibid.*

## II.

We first address the Appellate Division's introduction on its own motion and without notice to the parties of the issue of arbitrability. Ordinarily, courts do not raise issues that the parties have not raised. Sometimes, however, courts introduce new issues when the interests of justice require, if the introduction will not prejudice the parties. *Rivera v. Gerner,* 89 *N.J.* 526, 537–38, 446 *A.*2d 508 (1982); *R. Wilson Plumbing & Heating, Inc. v. Wademan,* 246 *N.J.Super.* 615, 617–19, 588 *A.*2d 444 (App.Div. 1991); *see also Bolyard v. Berman,* 274 *N.J.Super.* 565, 582 n. 6, 644 *A.*2d 1122 (App.Div.) (recognizing that Appellate Division should not pass on issues neither presented to trial court nor briefed on appeal), *certif. denied,* 138 *N.J.* 272, 649 *A.*2d 1291 (1994). If a court introduces a new issue, the better practice is to permit the parties to address it. Otherwise, courts deprive themselves of the benefit of the contributions of counsel. The opposing views of counsel often illuminate a case in an adversary system of justice. Our goal is not to inhibit innovative judicial solutions, but to encourage courts to invite counsel to participate in any such innovations. In the present case, we conclude that the Appellate Division should have permitted counsel to address the issue of

arbitrability. The interests of justice, moreover, did not compel the court to raise the issue on its own motion.

Apart from the terms of a written arbitration agreement, parties may consent either explicitly or implicitly to submit an issue to an arbitrator. *Grover v. Universal Underwriters Ins. Co.*, 80 *N.J.* 221, 229, 403 *A.2d* 448 (1979). Thus, in *Grover,* an arbitration clause in an insurance agreement required arbitration of certain issues, but not those pertaining to coverage. *Id.* at 226, 403 *A.2d* 448. We nonetheless found that because the defendant-insurer had submitted the issue of coverage to the arbitrator without objection from the insured, the issue "thereby came within the scope of those matters which the arbitrator could properly decide." *Id.* at 229, 403 *A.2d* 448.

Importantly, we discussed the steps a party should take to preserve the issue of arbitrability for a court:

> Defendant could have objected to arbitration of the coverage issue and protected its position in a number of ways. It could have instituted an action for a judicial decision on that issue and requested that the arbitration be stayed.... Defendant also had the choice of making an objection to the propriety of the arbitration on the ground of no coverage and participating in the arbitration proceeding under protest to decide the other ... questions. Use of either of these provisions would have preserved the issue of arbitrability for the court.
>
> [*Id.* at 230, 403 *A.2d* 448 (citations omitted).]

*See also McKeeby v. Arthur,* 7 *N.J.* 174, 181–82, 81 *A.2d* 1 (1951) (recognizing that, like any contract provision, parties may waive or revoke arbitration provision either expressly or by their conduct); *Highgate Dev. Corp. v. Kirsh,* 224 *N.J.Super.* 328, 540 *A.2d* 861 (App.Div.1988) (stating that party who submits issue to arbitration "may not disavow that forum upon the return of an unfavorable award").

Here, the State neither moved to stay the arbitration nor objected to the arbitrator's authority to interpret Section J. To the contrary, the State decided not to seek a stay of the arbitration, because "cases were piling up involving issues coming out of Article V, Section J." Instead, the State elected to "set forth on a specific arbitration regarding Article V, Section J," and to autho-

rize the arbitrator to "decide what the meaning was of J–1 through 5, and what was arbitrable under J–1 through 5, if anything." The parties memorialized their agreement in writing before the arbitrator. Indeed, it was the State, not the CWA, that asked the arbitrator to interpret Article V, Section J.

In addition to introducing the issue of the arbitrability of disputes under Section J, the Appellate Division also introduced the issue whether any such arbitration would be advisory or binding. Without analysis, the court concluded that the arbitration should be merely advisory. 296 *N.J.Super.* at 230, 686 *A.*2d 781. Because the issue had not been raised previously, neither the parties, the arbitrator, nor the Law Division had addressed it. The record, moreover, supports the conclusion that the parties intended the arbitration to be binding.

After the arbitrator identified the issues for resolution, the Deputy Attorney General stated that "the only thing" he wanted to clarify was that the arbitrator would not "render a specific decision with regard to Ms. Bomse's separation. This is simply a set of facts that has been established in order for you [, the arbitrator,] to make a contractual interpretation." Additionally, when asked whether the State would pursue resolution of the dispute in another forum, the OER's Director, Mr. Gelade, answered that the State reserved the right to "make a court challenge in the event that it was held that someone terminated without reason, had arbitration rights." If the arbitration were to have been merely advisory, rather than binding, it is unlikely that the State would have been concerned with the right to mount a "court challenge," as limited as that challenge might be.

We gain further insight from the uncontradicted certification submitted by Mr. Weissman, the CWA's attorney, in support of a motion for reconsideration in the Appellate Division. *See R.R.* 1:6–6; 2:5–5(b). Mr. Weissman has been actively involved in this matter, including the negotiations leading to the arbitration, from its inception. His certification explains in detail the facts support-

ing the conclusion that parties intended the arbitration to be binding.

Finally, Article V, Section H.5(e) states that any arbitration award shall be binding unless "specifically limited to an advisory award." No one placed any such limitation on the subject arbitration.

In effect, the Appellate Division raised on its own an issue that the State could not have raised. By raising the issue of arbitrability, the Appellate Division impermissibly gave the State a second bite at the apple. *Highgate, supra,* 224 *N.J.Super.* at 333, 540 *A.*2d 861.

### III.

Having found that the Appellate Division erred in holding that the interpretation of Article V, Section J was not arbitrable, we now must address the validity of the arbitration award. Arbitration is a favored means of settling labor-management disputes. *Scotch Plains–Fanwood Bd. of Educ. v. Scotch Plains–Fanwood Educ. Ass'n,* 139 *N.J.* 141, 149, 651 *A.*2d 1018 (1995). Resolution through arbitration should be the end of the labor dispute, not a way-station on route to the courthouse. Accordingly, courts limit their review of arbitration awards.

*N.J.S.A.* 2A:24–8 identifies the reasons a court may vacate an arbitration award. Two of the statutory reasons are relevant to this appeal:

a. Where the award was procured by corruption, fraud or undue means;

. . . .

d. Where the arbitrator exceeded or so imperfectly executed their powers that a mutual, final and definite award upon the subject matter submitted was not made.

[*Ibid.*]

The statutory phrase "undue means" ordinarily encompasses a situation in which the arbitrator has made an acknowledged mistake of fact or law or a mistake that is apparent on the face of the record. *PBA Local 160 v. Township of North Bruns-*

*wick*, 272 *N.J.Super.* 467, 474, 640 *A.*2d 341 (App.Div.), *certif. denied*, 138 *N.J.* 262, 649 *A.*2d 1283 (1994). Arbitrators also exceed their authority by disregarding the terms of the parties' agreement. *Ibid.*

▉▉▉▉ Generally, courts will accept an arbitrator's interpretation so long as the interpretation is reasonably debatable. *Old Bridge Tp. Bd. of Educ. v. Old Bridge Educ. Ass'n*, 98 *N.J.* 523, 527, 489 *A.*2d 159 (1985). A distinction exists, however, between public and private employment disputes. *PBA Local 160, supra*, 272 *N.J.Super.* at 472, 640 *A.*2d 341. When reviewing an arbitrator's interpretation of a public-sector contract, in addition to determining whether the contract interpretation is reasonably debatable, the court must also ascertain whether the award violates law or public policy. *Communications Workers of America v. Monmouth County Bd. of Social Services*, 96 *N.J.* 442, 448, 453, 476 *A.*2d 777 (1984); *PBA Local 160, supra*, 272 *N.J.Super.* at 473, 640 *A.*2d 341.

In the instant case, the arbitrator concluded that if an unclassified employee with six or more years of service can prove that the State fired the employee for misconduct, then, under Article V, Section J.5, the employee has the right to arbitrate the dismissal for "just cause." The State challenges the award on several grounds.

First, the State claims that the arbitrator exceeded his authority by ignoring Article V, Section J.3, which permits the State to terminate an unclassified employee "without stating the reasons therefore." Second, the State maintains that the award was procured by undue means because the arbitrator interpreted the labor agreement to establish terms and conditions of employment that the parties themselves could not have negotiated. Lastly, the State asserts that the arbitrator's interpretation impermissibly impinges on the employer's power to terminate unclassified employees for any reason or to determine whether to discipline formally an employee.

In response, the CWA argues that the arbitrator's contractual interpretation is reasonable and does not violate either statutory law or public policy. Moreover, the CWA insists that the State's public policy arguments are merely a ruse to induce the Court to address a scope-of-negotiations issue, which PERC should address initially.

■ We find the arbitrator's interpretation to be reasonable. Although Section J.3 recognizes the State's authority to dismiss unclassified employees without reason, Section J.5 evidences an intent to provide greater protection to unclassified employees with six or more years of service. Section J.5 permits those employees to appeal major discipline to Step Three arbitration. The provision would mean little to unclassified employees with six or more years of service, if the State could terminate those employees for misconduct without filing charges.

■ We also find the interpretation does not violate existing law or offend public policy. In public-sector collective negotiations, employment issues fall into one of two categories: " 'mandatorily negotiable terms and conditions of employment' and 'non-negotiable matters of governmental policy.' " *Teaneck Bd. of Educ. v. Teaneck Teachers Ass'n*, 94 *N.J.* 9, 14, 462 *A.*2d 137 (1983). A three-part test applies in determining whether an issue is negotiable:

[A] subject is negotiable between public employers and employees when (1) the item intimately and directly affects the work and welfare of public employees; (2) the subject has not been fully or partially preempted by statute or regulation; and (3) a negotiated agreement would not significantly interfere with the determination of governmental policy. To decide whether a negotiated agreement would significantly interfere with the determination of governmental policy, it is necessary to balance the interest of the public employees and the public employer. When the dominant concern is the government's managerial prerogative to determine policy, a subject may not be included in collective negotiations even though it may intimately affect employees' working conditions.

[*Local 195, IFPTE, AFL–CIO v. State*, 88 *N.J.* 393, 404–05, 443 *A.*2d 187 (1982).]

Applying the three-part test, we have no difficulty in concluding that the right to appeal a termination of employment intimately and directly affects the work and welfare of unclassified public

employees. Remaining are the issues whether any statute or regulation would have preempted negotiation of the disciplinary review procedure and whether the arbitration award will significantly interfere with a managerial prerogative.

The State Legislature has declared that unclassified employees are exempt from the tenure provisions of Title 11A, which apply to career service employees. *See N.J.A.C.* 4A:1–1.3 (defining "unclassified service" to mean "those positions and job titles outside the senior executive service, not subject to the tenure provisions of Title 11A"). Since 1982, however, disciplinary review procedures have been mandatorily negotiable. The New Jersey Employer–Employee Relations Act, *N.J.S.A.* 34:13A–1 to –29, provides in pertinent part:

> [T]he majority representative and designated representatives of the public employer shall meet at reasonable times and negotiate in good faith with respect to grievances, disciplinary disputes, and other terms and conditions of employment.
> . . . .
> Public employers shall negotiate written policies setting forth grievance and disciplinary review procedures by means of which their employees or representatives of employees may appeal the interpretation, application or violation of policies, agreements, and administrative decisions, including disciplinary determinations, affecting them, provided that such grievance and disciplinary review procedures shall be included in any agreement entered into between the public employer and the representative organization. Such grievance and disciplinary review procedures may provide for binding arbitration as a means for resolving disputes. . . .
>
> [*N.J.S.A.* 34:13A–5.3.]

Four references in *N.J.S.A.* 34:13A–5.3 to "disciplinary review procedures" confirm that such procedures may be subject to negotiation.

By reading statutes establishing unclassified employees' at-will status in conjunction with *N.J.S.A.* 34:13A–5.3, we gain insight into the intent of the Legislature. From our perspective, the two-step arbitration review procedure enunciated in the arbitration award is consistent with statutory law. *N.J.S.A.* 34:13A–5.3 authorizes the State to negotiate disciplinary review procedures, including binding arbitration. We disagree with the State's assertion that *N.J.S.A.* 34:13A–5.3 permits negotiation of disciplinary

review procedures only for employees who are disciplined. Implicit in the right to negotiate disciplinary review procedures is the right to negotiate the means to enforce those procedures. Contrary to the State's assertion, permitting an arbitrator to decide whether the dismissal relates to performance or misconduct will not require the State to discipline an employee it otherwise would not have disciplined. The award simply provides a mechanism to ascertain whether the State, in an attempt to circumvent the agreed disciplinary review procedures, has tacitly disciplined an unclassified employee.

The award, moreover, does not significantly interfere with management's inherent prerogative to determine discipline. As the Law Division found:

[T]he arbitrator's interpretation does not have such a radical impact upon plaintiff's prerogative. It allows plaintiff to discharge "at will" employees without stating reasons, and in doing so it places a substantial burden upon any employee who believes that he or she was discharged for misconduct. Such employees must be employed for six or more consecutive years, must come forward to raise the issue of misconduct and must persuade the arbitrator the discharge was for misconduct. Only after all of these requirements have been satisfied may such employees ask an arbitrator to determine whether there was just cause for the discharge.

The State maintains that under the arbitrator's award it may be forced to prove, even when it never charges an employee with misconduct, that it had just cause to terminate the employee. We acknowledge that it may seem counter-intuitive to permit an employer to fire an employee for no reason, yet require the employer to provide a hearing to an employee who is not charged with misconduct. It is not for us, however, to question the wisdom of a clause to which the State has twice agreed in collective negotiations. If the State made a bad deal, the place to remedy it is at the bargaining table.

Lastly, the arbitrator's award does not offend public policy. A procedure that shifts the burden of persuasion between employee and employer is familiar in the employment context. Employment discrimination cases in which employers deny terminating employees for discriminatory reasons illustrate the point. Because of the conflict between an employer's right to terminate an at-will em-

ployee and the employee's protection against illegal discrimination, both Federal and State courts follow a procedure in which the burden of production shifts between employer and employee. *See, e.g., McDonnell Douglas Corp. v. Green,* 411 *U.S.* 792, 93 *S.Ct.* 1817, 36 *L. Ed.*2d 668 (1973); *Andersen v. Exxon Co.,* 89 *N.J.* 483, 446 *A.*2d 486 (1982); *Maiorino v. Schering–Plough Corp.,* 302 *N.J.Super.* 323, 695 *A.*2d 353 (App.Div.1997).

Requiring a public employer to provide reasons for a termination, moreover, does not by itself significantly impinge on managerial authority. In *Donaldson v. Board of Education,* 65 *N.J.* 236, 320 *A.*2d 857 (1974), we addressed the issue whether a public school teacher who was denied tenure was entitled to a statement of reasons for her dismissal. We acknowledged that the local school board possessed broad discretion in granting or denying tenure. *Id.* at 241, 320 *A.*2d 857. Fundamental fairness and justice nonetheless required disclosure of the reasons for a teacher's termination. *Id.* at 245, 320 *A.*2d 857. Admittedly, the expectations of non-tenured teachers and unclassified employees differ: teachers may anticipate receiving tenure, but unclassified employees know they will never enjoy such security. *Donaldson,* however, confirms that merely requiring an employer to provide reasons for a termination does not significantly impinge on managerial prerogative.

*Walsh v. State,* 147 *N.J.* 595, 689 *A.*2d 131 (1997), *adopting dissent in* 290 *N.J.Super.* 1, 674 *A.*2d 988 (App.Div.1996), on which the State relies, is distinguishable. *Walsh* involved an Assistant Deputy Public Defender who claimed that the Public Defender had breached an implied contract to promote him. 290 *N.J.Super.* at 4, 674 *A.*2d 988. In a divided opinion, the Appellate Division agreed with the Assistant Deputy Public Defender. *Id.* at 4, 674 *A.*2d 988. Judge Skillman dissented, finding that the Public Defender had no authority to contract to promote the assistant. *Id.* at 15–16, 674 *A.*2d 988 (Skillman, J.A.D., dissenting). Rather, "so long as his personnel actions are not invidiously discriminatory, the Public defender has unfettered discretion in determining

whether to hire, discharge, transfer, demote or withhold promotion from an Assistant Deputy Public Defender." *Id.* at 13, 674 *A.*2d 988. We reversed in reliance on Judge Skillman's dissent.

Unlike the present case, *Walsh* did not involve the issue of negotiability of disciplinary review procedures. Neither does the present case raise the issue of the State's inherent authority to discharge or discipline an unclassified employee. The issue is whether the State may circumvent the agreed disciplinary review procedures by terminating unclassified employees for misconduct without officially charging the employees with misconduct. We hold that it may not.

Finally, we hold that the arbitrator's decision on the burden of proof issue is reasonable. Because Article V, Section J.5 requires a traditional showing of "just cause," the arbitrator could conclude that the State also intended to adhere to traditional burdens of proof once employees satisfied their burden under Section J.5.

The judgment of the Appellate Division is reversed and the judgment of the Law Division is reinstated.

*For reversal and reinstatement*—Chief Justice PORITZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN, and COLEMAN—7.

*Opposed*—None.