813 A.2d 621 (2002)
356 N.J. Super. 567
LIBERTY MUTUAL INSURANCE COMPANY, Plaintiff,
v.
OPEN MRI OF MORRIS & ESSEX, L.P., Defendant.
Superior Court of New Jersey, Law Division, Morris County.
Decided September 27, 2002.
*622 Thomas O. Mulvihill, Parsippany, for plaintiff, (Pringle Quinn Anzano, attorneys).
Eric H. Weitz, Mount Laurel, for defendant, (Andrew L. Stern, Morristown, attorney).
VILLANUEVA, J.A.D. (retired and temporarily assigned on recall).
This case involves the integrity of the arbitration process and whether a court can vacate an award when there was a manifest disregard of the law by the arbitrator.
Plaintiff Liberty Mutual Insurance Company ("Liberty Mutual") seeks to vacate the arbitration award in Open MRI of Morris & Essex a/s/o Michele Toriello v. Liberty Mutual Insurance Company and to declare that Liberty Mutual has no obligation to provide personal injury protection ("PIP") coverage to the defendant Open MRI of Morris & Essex, L.P. ("Open MRI of Morris & Essex") for MRI services rendered to Michele Toriello, its assignor. An opposition and cross motion *623 has been filed by defendant to confirm the arbitration award and to dismiss the plaintiffs complaint.
The issue is whether the court can set aside an arbitration award given to an unlicensed health care provider who was warned by the New Jersey Department of Health and Senior Services ("Department") that it could not provide diagnostic testing before obtaining a license, by an arbitrator who showed a manifest disregard of the law, which award was clearly a violation of public policy that prohibits unlicensed medical providers to practice and receive fees.
On April 19, 1999, the Department published:
... notice of the requirement for all entities providing magnetic resonance imaging (MRI services to be inspected and annually licensed by the Department). MRI services are inspected according to the ambulatory care standards set forth in N.J.A.C. 8:43A. Failure to become licensed may subject the entity to penalties, including civil monetary fines for operation of a health care facility without the required license. However, for one time only and only for MRI services, if a licensure application is submitted on or before September 1, 1999, and a license is issued on or before December 31, 1999, no penalties shall be imposed. (Emphasis added.)

[31 N.J.R. 1109(b).]
On November 5, 1999, Open MRI of Morris & Essex performed MRI testing upon Michele Toriello, a Liberty Mutual insured, who assigned her PIP claim to Open MRI of Morris & Essex. They subsequently submitted a claim to Liberty Mutual seeking payment for said testing. At that time Open MRI of Morris & Essex was operating without a license in violation of N.J.S.A. 26:2H-12(a) and N.J.A.C. 13:35-6.16.
Open MRI of Morris & Essex requested a license by letter dated November 2, 1999, when its building was ready for occupancy. It received its license on January 13, 2000.
When Liberty Mutual denied this claim because the services were rendered by an unlicensed facility, Open MRI of Morris & Essex filed a claim for arbitration before the American Arbitration Association ("AAA"). After the hearing, Joseph H. Cerame, Esq., the arbitrator designated by AAA, issued the following award:
The issue in this case is whether payment for services is due a Diagnostic testing facility because they did not yet have a license to perform service, from the State of New Jersey.
Respondent contends that the absence of the license is fatal to the claim. Claimant points out that the testing was performed by a licensed radiologist. The State of New Jersey inspected the premises and did not order the business to cease and desist from activity and shortly thereafter generated a license giving authority to the facility to perform such testing as is relevant to this claim. All this was done within a reasonably short time of the testing relevant to this claim. Claimant contends the testing at issue here was done during an amnesty period, during which the licensing acquisition process was ongoing and therefore the professional portion of the bill should be paid at least.
It is determined that the state of licensing was in flux. It is further determined that the Claimant was performing such activity as would allow it to become licensed as required by the appropriate Regulation. Additionally, this facility was operated in relevant part by a properly licensed radiologist. For these reasons, *624 it is determined that coverage of the bill submitted is to be covered and paid in the normal fashion subject to the usual reductions.
The arbitrator then awarded Open MRI of Rochelle Park (sic) $1,450 together with attorneys fees of $1,000 and costs of $325.
CONTENTIONS OF OPEN MRI OF MORRIS & ESSEX
Open MRI of Morris & Essex argues before this court, as it did before the arbitrator, that the Department's April 19, 1999 New Jersey Register announcement not to impose monetary penalties on unlicensed MRI facilities if they apply for a license by September 1, 1999, and receive the license by December 31, 1999, should be construed as an administrative ratification of its own unlicensed operations. This argument is specious and lacks any foundation in law. As a starting point, as a creature of the Legislature, the Department's legal authority is exclusively statutory. New Jersey Department of Labor v. Pepsi-Cola, Co., 170 N.J. 59, 784 A.2d 64 (2001); In Re Regulation F-22, Office of Milk Indus., 32 N.J. 258, 160 A.2d 627 (1960). Its power is limited to those expressly granted by statute or those fairly implied as necessary to carry out its assigned function. New Jersey Department of Labor, supra, 170 N.J. at 61, 784 A.2d 64. Nothing in the Health Care Facilities Planning Act, N.J.S.A. 26:2H-1 to -26, confers upon the Department the legal authority to ratify the unlicensed operations of MRI facilities by administrative fiat. In fact, in this respect, the language in the Act is clear in expressing the opposite conclusion. "No health care facility shall be operated unless it shall possess a valid license issued pursuant to this act...." N.J.S.A. 26:2H-12a.
The Department's statutory authority to levy penalties is found in N.J.S.A. 26:2H-14. "Any person, firm, partnership, corporation or association who shall operate or conduct a health care facility without first obtaining the license required by this act...shall be liable to a penalty of not more than $1,000 as provided for by regulation for each day of operation in violation hereof for the first offense and for any subsequent offense." (Emphasis added.)
In contrast to the injunctive language employed by the Legislature in the area of licensing, the penalty provisions reveal the legislative intent to confer a measure of discretion in the execution of this authority. This is due to the nature of the administrative agency's function in this respect. In determining whether monetary penalties are warranted the Commissioner or his designee is performing a quasi-judicial function. N.J.AC. 8:431.10. Like a court's determination of the appropriate sentence to impose in any given case, the Commissioner must consider mitigating and aggravating factors in fashioning a sanction which will serve the policy embodied in the Act. See State of New Jersey, Dept. of Health v. Wayside Retirement Center, 92 N.J.A.R. 2d (HTL) 27 (1992). The phrase "not more than" sets a ceiling, not a floor. However, in his discretion, the Commissioner is also authorized to conclude that no monetary sanction was warranted. N.J.A.C. 8:43E-3.1. Apparently, in the case of certain MRI facilities operating without a license prior to April 19, 1999, the Commissioner concluded that no sanction was warranted. However, the Commissioner's decision not to levy monetary penalties does not operate to repeal the licensing requirement imposed by the Legislature in N.J.S.A. 26:2H-12a, or to legitimize unlicensed activities.
Returning now to the PIP statute, since N.J.S.A. 39:6A-2(l) defines the term "health care provider" to include radiology *625 and diagnostic facilities licensed by the Department of Health and Senior Services, this court holds that Open MRI of Morris & Essex was not eligible to receive PIP reimbursement under N.J.S.A. 39:6A-5 for magnetic resonance imaging services performed on plaintiff's insureds during the period of time it operated without the required license. Most importantly, Open MRI of Morris & Essex did not fall within the window of opportunity for amnesty, which required that the licensure application be submitted on or before September 1, 1999, and a license issued on or before December 31, 1999.
LIBERTY MUTUAL'S CONTENTIONS
Liberty Mutual argues that the arbitrator's award should be vacated as it was the product of undue influence or other factors which prejudiced Liberty Mutual's rights because undisputed law is that the failure of an MRI facility to have a license renders it ineligible to receive PIP benefits. Liberty Mutual also argues that the arbitrator's decision violated clear mandates of public policy and constituted a manifest disregard of the law.[1]
Open MRI of Morris and Essex has cross moved for an order to dismiss the complaint and confirm the arbitration award on the grounds that an error of law is not sufficient to vacate an arbitration award under N.J.S.A. 2A:24-8 and Liberty Mutual has failed to set forth any evidence which shows fraud on the part of the arbitrator.
WAS THE ARBITRATOR'S DECISION CONTRARY TO APPLICABLE LAW?
Prior to discussing whether or not this court has the authority to vacate an arbitration award under applicable law, it must first be established whether or not the determination of the arbitrator was clearly incorrect under the applicable standards of law.
This matter was brought before the AAA to determine whether Open MRI of Morris & Essex's failure to possess an ambulatory care license when these services were rendered makes it ineligible to obtain PIP benefits for services rendered to a patient. The arbitrator held that the state of licensing was in flux and determined that Open MRI of Morris & Essex was performing such an activity as would allow it to become licensed as required by the appropriate regulation. He further determined that this facility was operated in relevant part by a properly licensed radiologist. Thus, for those reasons, he held that, not withstanding the lack of a license, this bill should be paid in the normal fashion subject to the usual reductions. The plaintiff argues that the defendant's bills were not entitled to PIP coverage since it did not possess an ambulatory care license.
LICENSURE STATUTE
The controlling statute is N.J.S.A. 26:2H-12a, which specifically states: "No health care facility shall be operated unless it shall: 1) possess a valid license issued pursuant to this act which license shall specify the kind or kinds of health care services the facility is authorized to provide...."
In numerous cases, courts have routinely held that a health care facility is required to obtain an ambulatory care facility. *626 license and its failure to do so renders it ineligible to receive PIP benefits. See Allstate Insurance Co. v. Orthopedic Evaluations, Inc., 300 N.J.Super. 510, 693 A.2d 500 (App.Div.1997), and Prudential Property Casualty Ins. Co. v. Midlantic Motion X-Ray, Inc., 325 N.J.Super. 54, 737 A.2d 711 (Law Div.1999), where the courts held that defendants' bills did not qualify for PIP coverage. Because Open MRI of Morris & Essex lacked the appropriate license when it performed the subject services, it is not entitled to PIP benefits from Liberty Mutual as a matter of law. The court's decision that the statutory requirement that health care facilities like Open MRI of Morris & Essex be licensed before commencing operations is without doubt a significant qualifying requirement of law that bears upon the rendition of this service which Open MRI of Morris & Essex provides and for which it seeks PIP coverage.
Recently, in a case decided almost three weeks before the arbitration award herein, Material Damage Adjustment Corp. v. Open MRI of Fairview, 352 N.J.Super. 216, 799 A.2d 731 (Law Div.2002), Judge Jose L. Fuentes (then sitting in the Law Division) specifically held that an unlicensed MRI clinic was not legally entitled to receive payment for PIP benefits during the two-year period when it was not licensed even though it subsequently obtained a license.
The court held that:
Open MRI's unlicensed operations from September 1997 to June [8], 1999 represent a flagrant violation of these statutory and regulatory requirements. Based upon the evidence presented before this court, the entire operation was conducted without governmental oversight. From the configuration and construction of the physical plant to the equipment utilized to administer the
MRI tests; from the makeup of the onsite staff to the make-up and structure of the management team; from financial resources to quality control; all this was done without regard for the legal standards set by the Legislature and the State Department of Health. In short, this was a rogue operation, functioning completely outside the law.
[Id. at 226-27, 799 A.2d 731.]
This case is very similar to Material Damage Adjustment Corp., supra, where the facility was specifically warned by the Department of Health (as was Open MRI of Morris & Essex) that it could not operate without the required license, id. at 227, 799 A.2d 731, but did so prior to obtaining a license. Therefore, Judge Fuentes held that, because of the pattern of fraud, "there is no question that plaintiff is entitled to treble damages [under N.J.S.A. 17:33A-7b]." Id. at 233, 799 A.2d 731.
In analyzing whether Open MRI had "knowingly" violated the Insurance Fraud Prevention Act, Judge Fuentes stated:
As a matter of law, entities wishing to engage in a highly regulated business which directly impacts on the health and safety of the public, such as the delivery of health care, are constructively on notice of the existence of legal requirements governing its practice and operations. Those who, nonetheless, venture forth without first obtaining the required governmental approvals, whether out of ignorance or arrogance, do so at their own risk and must face the legal consequences for their actions. Sound public policy can accept no lesser standard.
[Id. 352 N.J.Super. at 227, 799 A.2d 731.]
LEGISLATIVE INTENT
Open MRI of Morris & Essex's right to collect payment for services rendered is *627 governed by the New Jersey Automobile Reparation Reform Act, N.J.S.A. 39:6A-1 to -35. The Legislature amended this Act in 1998 with the expressed purpose of containing the escalating costs of insurance in New Jersey. N.J.S.A. 39:61.1. One of the principal means of containing insurance premiums is the detection and deterrence of insurance fraud. Merin v. Maglaki 126 N.J. 430, 436, 599 A.2d 1256 (1992).
The Department's mandate to oversee the operations of health care practices such as Open MRI of Morris and Essex can be found in the Health Care Facilities Planning Act, N.J.S.A. 26:2H-1 to -26. As stated previously, N.J.S.A. 26:2H-12a mandates that all health care facilities, such as Open MRI of Morris & Essex, be licensed and subject to inspection. To effectuate the provisions of this Act, the Commissioner of the State Department of Health and Senior Services has the power to inquire into the operation of health care facilities and to conduct periodic inspections of such facilities with respect to fitness and adequacy of premises, equipment, personnel, rules and bylaws and the adequacy of financial resources and future revenues. To implement this grant of authority and carry out its responsibilities, the Act empowers the Department of Health to promulgate regulations regarding MRI facilities. N.J.A.C. 8:43A-1.1.
In addition, in order to obtain a license, all applicants must demonstrate that they have the capacity to operate an ambulatory care facility in accordance with the rules promulgated under N.J.A.C. 8:431.1. "An application for a license may be denied if the applicant cannot demonstrate that the premises, equipment, personnel, including principals and management, finances, rules and bylaws and standards of health care are fit and adequate and that there is reasonable assurance that the health care facility will be operated in accordance with the standards required by these rules...." N.J.A.C. 8:43A-2.2(1).
The licensing requirements also prescribe that, prior to initiating any work, any plans for the construction, expansion or renovation of the MRI facilities be reviewed and approved by the Department. N.J.A.C. 8:43A-2.4(a). After the work is completed the Department is required to inspect the site "to verify that the building has been constructed in accordance with the architectural plans approved by the Department." Material Damage Adjustment Corp. v. Open MRI of Fairview, supra, 352 N.J.Super. at 226, 799 A.2d 731.
Thus, the licencing scheme is more than just filling out some paperwork. As Judge Fuentes' analysis in Material Damage Adjustment Corp. v. Open MRI of Fairview, supra, reveals, the licencing scheme covers all aspects of the operations of an MRI facility from the proposal phase to construction design: equipment, staffing, management structure, and quality assurance. Id. Thus, after an applicant applies for a license the Department is constantly involved in overseeing the facility.
Compelling insurance carriers to make payment for services which were rendered illegally, despite the fact that the diagnostic facility had been notified that a license was required before it could begin offering services, would encourage the defendant and other unlicensed MRI providers to ignore their obligations to obtain the necessary license before commencing operations. Condoning such illegality would not foster the goal of insuring that the health care services rendered in New Jersey are of the highest quality, of demonstrated need, efficiently provided and properly utilized at reasonable cost. See N.J.S.A. 26:2H-1. Instead, such a holding would require insurance companies to pay all PIP medical bills, even when medical providers *628 are not licensed and in violation of the New Jersey Insurance Fraud Prevention Act. N.J.S.A. 17:33A-1 to -30.
Thus, these highly regulated systematic rules and regulations require an MRI facility to have a license. Without a license being issued, the Department would not be able to regulate anything within the MRI facility, from the person who treats the patients to whether they are appropriately treated. Therefore, as this is a subject which clearly involves the public interest with regard to the safety and welfare of those people who use the services provided by the facility, it is also in the public interest to be certain that every MRI facility complies with these applicable regulations. Otherwise, it would require PIP payments to providers who failed to properly follow the law to be rewarded for their illegal action.
DID LIMITED "AMNESTY" GRANTED BY THE DEPARTMENT EXTIGUISH LIBERTY MUTUAL'S DFENSE OF ILLEGALITY?
In its opposition and cross motion to confirm the arbitration award, Open MRI of Morris & Essex argues that on April 19, 1999, the Department launched an "amnesty" program by issuing a notice advising MRI facilities, such as Open MRI of Morris & Essex, of their obligation to become licenced. As Open MRI of Morris & Essex was issued a license on January 13, 2000, with no penalties being imposed, they argue that all bills submitted to Liberty Mutual should be paid in full because the State never assessed any penalties due to the failure to have a license at the time their services were provided to Michele Toriello.
Judge Fuentes addressed this issue of whether the Commissioner's decision not to levy monetary penalties operated to nullify the licensing requirement imposed by the Legislature. He stated:
This argument is specious and lacks any foundation in law .... Nothing in the Health Care Facilities [Planning] Act confers upon the Department the legal authority to ratify the unlicensed operations of MRI facilities by administrative fiat. In fact, in this respect, the language in the Act is clear in expressing the [o]pposite conclusion. "No health care facility shall be operated unless it shall possess a valid license issued pursuant to this act...." N.J.S.A. 26:212(a).
[Id. at 228, 799 A.2d 731.]
The foregoing authorities plainly establish that the arbitrator's decision constituted a manifest disregard of law. It is undisputed that the defendant was required to, but did not, possess an ambulatory care facility license when services were rendered to Michele Toriello on November 5, 1999, nor did it fall within the amnesty period. In addition, on May 6, 1997, in the Department's letter approving Open MRI of Morris & Essex's application for the issuance of a Certificate of Need, it had specifically stated "Finally, please be advised that services may not commence until such time as a license has been issued by the Certificate of Need and Acute Care Licensure Program." (Emphasis added.) Therefore, this court is satisfied that the arbitrator manifestly disregarded the law and erroneously entered an award in favor of Open MRI of Morris & Essex. However, even after reaching this conclusion, it must be determined whether this court has the authority to vacate this arbitration award, even though it was erroneously entered.
THIS COURT'S ABILITY TO VACATE AN ARBITRATION AWARD.
The applicable section of the No-Fault Act provides that, "all automobile insurers *629 and the Unsatisfied Claim and Judgment Fund shall provide any claimant with the option of submitting a dispute under this section to dispute resolution ...." N.J.S.A. 39:6A-5i.
N.J.S.A. 2A:24-8 provides a limited number of statutory grounds when an arbitration award may be vacated. The statute provides that the court shall vacate the award in any of the following cases:
a. Where the award was procured by corruption, fraud or undue means;
b. Where there was either evident partiality or corruption in the arbitrators, or any thereof;
c. Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause being shown therefor, or in refusing to hear evidence, pertinent and material to the controversy, or of any other misbehavior prejudicial to the rights of any party;
d. Where the arbitrators exceeded or so imperfectly executed their powers that a mutual, final and definite award upon the subject matter was not made.
A. Undue means
The general rule is that the standard review of an arbitration award on a claim for PIP benefits requires a determination whether the arbitrator engaged in fraud, corruption or similar wrongdoing, not whether substantial credible evidence supported the award. See Tretina Printing, Inc. v. Fitzpatrick and Associates, Inc., 135 N.J. 349, 358, 640 A.2d 788 (1994); Habick v.Liberty Mutual Fire Ins. Co., 320 N.J.Super. 244, 248, 727 A.2d 51 (App.Div.), certif. denied, 161 N.J. 149, 735 A.2d 574 (1999); Clarendon Nat. Ins. v. Neuro-Imaging Diagnostics, Inc., 321 N.J.Super. 248, 251, 728 A.2d 843 (App. Div.1999).
Liberty Mutual first argues that an order vacating the arbitration award should be granted as the award was erroneous as a matter of law and the product of undue means. As set forth previously, New Jersey case law which addresses the issue of an MRI facility's entitlement to payment for services which were rendered before the facility was licensed succinctly holds that the facility is not entitled to payment. The legal standard for vacating an arbitration award on the grounds of undue means requires a showing on the face of the award that the arbitrator meant to decide according to the law and clearly applied the wrong legal rule. See State of New Jersey Office of Employee Relations v. Communications Workers of America, AFL-CIO, 154 N.J. 98, 111-12, 711 A.2d 300(1998) (Court stated that undue means exists where "the arbitrator has made an acknowledged mistake of fact that is apparent on the face of the record"). Here, it is apparent that the arbitrator meant to decide the issues submitted according to New Jersey law as the arbitrator is required to decide issues in accordance with New Jersey law. See Rule 28, Rules of the American Arbitration Association. The cases cited previously clearly establish that the correct legal rule in situations such as in the present case is that if an MRI facility does not possess an ambulatory care license when the subject services were rendered, the facility is not entitled to PIP coverage for said services. Since the arbitrator ignored this prohibition, factually and legally, at the insistence of the claimant, the arbitrator applied the incorrect legal rule. The award, therefore, should therefore be vacated as it was the product of undue means.
B. Public Policy
Another argument of Liberty Mutual is that the award should be vacated for public policy reasons. Liberty Mutual *630 argues that the arbitrator's award should be subjected to an increased level of scrutiny since the arbitrator's decision violates clear mandates of New Jersey's public policy designed to prevent automobile insurance fraud. In Weiss v. Carpenter, Bennett & Morrissey, 143 N.J. 420, 672 A.2d 1132 (1996), the Court held that an arbitrator's award is subject to vacation under the public policy exception to the general rule governing the vacation of arbitration awards due to a mistake of law if the arbitrator's resolution of the public policy question is not reasonably debatable and plainly would violate a clear mandate of public policy. Id. at 443, 672 A.2d 1132. Open MRI of Morris & Essex agrees that this matter involves public policy, yet argues that the public policy at issue in this case is that the court should rely on arbitration awards, not vacate them.
Liberty Mutual, however, argues that compelling insurance carriers to make payment for services which were rendered illegally would be violative of public policy against the massive problem of insurance fraud. Liberty Mutual distinguishes the cases of Clarendon National Ins. Co. v. Neuro-Imaging Diagnostics, Inc., supra, and Habick v. Liberty Mutual Fire Ins. Co. supra, cited by Open MRI of Morris & Essex for their proposition that the arbitrator's award should be upheld. Liberty Mutual argues that these cases are distinguishable since the issues presented to the arbitrator did not implicate issues of wide-spread public policy as is the case here, rather the standard of review of an arbitration award was not whether substantial credible evidence supported the award. Applying an increased level of scrutiny in those cases would have been inappropriate. However, as public policy issues are involved here, an increased level of judicial scrutiny should be applied, and the arbitration award should be vacated as the award is in manifest disregard of law and contrary to established public policy.
C. Manifest Disregard of Law
The New Jersey Arbitration Law, N.J.S.A. 2A:24-1 to -10, has been patterned after, although not similar to, the Uniform Arbitration Act and the Federal Arbitration Act ("FAA"), 9 U.S.C.A. §§ 1-16, which governs arbitration agreements in the vast transactions involving interstate commerce. In fact, the New Jersey Legislature is now considering substantial amendments which do not in any way affect this award.[2]
Although no New Jersey court has discussed the effect of an arbitrator's manifest disregard of the law, the United States Supreme Court has made reference to this concept as have federal circuit courts and district courts. See Wilko v. Swan, 346 U.S. 427, 436-437, 74 S.Ct. 182, 98 L.Ed. 168 (1953), and the more recent opinion of Justice Breyer for a unanimous United States Supreme Court in First options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 948-949, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995).
Additionally, some state courts have adopted this basis for vacating an arbitration award. Manifest disregard of the law was the basis of the more recent holding in the circuit court decisions in Montes v. Shearson Lehman Brothers, Inc., 128 F. 3d 1456 (11th Cir.1997), and Halligan v. Piper Jaffray, Inc., 148 F.3d 197 (2nd Cir. *631 1998), cert. denied, 526 U.S. 1034, 119 S.Ct. 1286, 143 L.Ed.2d 378 (1999).
Though these cases were cited under the Federal Arbitration Act, 9 U.S.C.A. §§ 1-16, as the United State Supreme Court made clear, the FAA applies in state courts as well as federal courts. Southland Corp. v. Keating, 465 U.S. 1, 16, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984); Allied-Bruce Terminix Co., Inc. v. Dobson, 513 U.S. 265, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995). See generally Hayford and Kerrigan, Vacatur, the Non-Statutory Grounds for Judicial Review of Commercial Arbitration Awards, Dispute Resolution Journal, October, 1996 at pages 22 et. seq.
The following excerpts have been taken from the official NCCUSL Draft of the Uniform Arbitration Act, as finally approved in August 2000.[3] Here, I will only include some of the comments and Reporter's Notes after "Section 23 Vacating Award," as it discusses the concept of "manifest disregard of the law."
C. Reporter's Notes On the Possible Codification of the "Manifest Disregard of the Law" and the "Public Policy" Grounds for Vacatur:
1. A question has arisen as to the advisability of adding two new subsections to section 23(a) sanctioning vacatur of awards that result from a "manifest disregard of the law" or for an award that violates "public policy." Neither of these two standards is presently codified in the FAA or in any of the state arbitration acts. However, all of the federal circuit courts of appeals have embraced one or both of these standards in commercial arbitration cases. See Stephen L. Hayford, Law in Disarray: Judicial Standards for Vacatur of Commercial Arbitration Awards, 30 Ga. L.Rev. 734 (1996).
2. "Manifest disregard of the law" is the seminal nonstatutory ground for vacatur of commercial arbitration awards. The relevant case law from the federal circuit courts of appeals establishes that "a party seeking to vacate an arbitration award on the ground of `manifest disregard of the law' may not proceed by merely objecting to the results of the arbitration." O.R. Securities, Inc. v. Professional Planning Associates, Inc., 857 F.2d 742, 747 (11th Cir.1988). "Manifest disregard of the law" "clearly means more than [an arbitral] error or misunderstanding with respect to the law." Carte Blanche (Singapore) Pte., Ltd. v. Carte Blanche Int'l., 888 F.2d 260, 265 (2d Cir.1989) (quoting Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker, 808 F.2d 930, 933 (2d Cir.1986)).
The numerous other articulations of the "manifest disregard of law" standard reflected in the circuit appeals court case law reveal its two constituent elements. One element looks to the result reached in arbitration and evaluates whether it is clearly consistent or inconsistent with controlling law. For this element to be satisfied, a reviewing court must conclude that the arbitrator misapplied the relevant law touching upon the dispute before her in a manner that constitutes something akin to a blatant, gross error of law that is apparent on the face of the award.
The other element of the "manifest disregard of the law" standard requires a reviewing court to evaluate the arbitrator's knowledge of the relevant law. Even if a reviewing court finds a clear error of law, vacatur is warranted under *632 the "manifest disregard of the law" ground only if the court is able to conclude that the arbitrator knew the correct law but nevertheless "made a conscious decision" to ignore it in fashioning the award. See M & C Corp. v. Erwin Behr GmbH & Co., 87 F.3d 844, 851 (6th Cir.1996). For a full discussion of the "manifest disregard of the law" standard, see Stephen L. Hayford, Reining in the Manifest Disregard of the Law Standard: The Key to Stabilizing the Law of Commercial Arbitration, 1999 J. Disp. Resol. 117.
Ordinarily, a federal court may vacate or modify an arbitration award only where the award is "completely irrational, exhibits a manifest disregard of law, or otherwise falls within one of the grounds set forth in [the FAA]." Lapine Technology Corp. v. Kyocera Corp., 130 F.3d 884, 888 (9th Cir.1997) (citation and internal quotations omitted); see also Lew Lieberbaum & Co., Inc. v. Randle, 85 F.Supp.2d 123, 126 (E.D.N.Y.2000) ("A person seeking to vacate an award for manifest disregard must show that the error was obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator.").
In Halligan, supra, the plaintiff was found to have introduced "strong evidence" of age-based discrimination, and his employer conceded he was "basically qualified." 148 F.3d at 198. The arbitrators, however, without an opinion, denied relief to Halligan. On appeal, the court stressed that Halligan had presented overwhelming evidence. He had contemporaneous notes of discriminatory statements, he presented numerous witnesses who acknowledged the discrimination, and he demonstrated his strong qualification. In light of this overwhelming evidence and the fact that the arbitrators were "correctly advised of the applicable legal principles", the court concluded that the arbitrators had "ignored the law or the evidence or both." Id. at 204. The court also appeared to rely upon the arbitrators' failure to state any reasons for denying relief:
[W]hen a reviewing court is inclined to hold that an arbitration panel manifestly disregarded the law, the failure of the arbitrators to explain the award can be taken into account. Having done so, we are left with the firm belief that the arbitrators here manifestly disregarded the law or the evidence or both.

[Id.]
In Montes v. Shearson Lehman Brothers, Inc., supra, Circuit Court Judge Barkett stated:
Montes does not argue in this case that any of the statutory reasons for reversal of the arbitration board's decision are applicable. She argues that the award should be vacated because the arbitrators were explicitly urged to disregard the law and, in light of the nature of the evidence presented, there is nothing in the record to show that they did not do so. To enforce the arbitration decision under these circumstances, Montes argues, is violative of public policy.

....
Thus, every other circuit except the Fifth (which has declined to adopt any non-statutory grounds for vacating arbitration awards), has expressly recognized that "manifest disregard of the law" is an appropriate reason to review and vacate an arbitration panel's decision. See Prudential-Bache Sec., Inc. v. Tanner, 72 F.3d 234 (1st Cir.1995); Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp., 103 F.3d 9 (2d Cir.1997); (other citations omitted).
[Id. 128 F.3d at 1459-60.]
*633 In this Liberty Mutual arbitration the claimant not only urged the arbitrator to adopt erroneous facts regarding licensure but also to totally disregard the licensure law which the arbitrator did. Either a medical provider is licensed or he, she or it is not. Here, where Open MRI of Morris & Essex was clearly not licensed, and had been advised that it could not operate without a license, the arbitrator manifestly disregarded the licensing laws.
CONCLUSION
If an arbitrator can issue an award to an unlicensed medical practitioner who has been warned by the Department of Health that he could not operate until the license is issued, the arbitration process is a sham!
The arbitration award here is violative of explicit public policy and it also constituted a manifest disregard of the law. Therefore, the motion to vacate the arbitration award is granted, and defendant's cross motions are denied.
NOTES
[1] Liberty Mutual also alleges that one or more individuals who possessed a partnership interest in Open MRI of Morris & Essex were not licensed healthcare providers as defined in N.J.A.C. 11:3-4.2. However, this argument is not addressed for purposes of these motions.
[2] This state is indebted to Ronald M. Sturtz, Esq., a state and national authority on arbitration who has been the official American Bar Association adviser for the Drafting Committee of the National Conference of Commissioners on Uniform State Laws for the past five years and is presently assisting the New Jersey State Senate in the amendments to Arbitration Act, S-514, which is expected to be voted upon on September 30, 2002.
[3] The complete text of the Uniform Arbitration Act of 2000 with official comments (94 printed pages) can be found at the NCCUSL website maintained by the University of Pennsylvania Law School at: http:/www.law. upenn.edu/bll/ulc/ulc_frame.htm